**Sidney R. SOLOMON and Beatrice Solomon, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 185, Docket 77–4120.**

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1977.

Decided Dec. 14, 1977.

---

John S. Nolan, Washington, D. C. (Robert L. Moore, II, Lee M. Goodwin, Miller & Chevalier, Washington, D. C., of counsel), for appellants.

F. Arnold Heller, Atty., Tax Div., Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Grant W. Wiprud, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before WATERMAN, ANDERSON and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Mr. and Mrs. Sidney R. Solomon appeal from a decision of the Tax Court which upheld an IRS determination of a deficiency of $46,492.42 in their joint return for the 1971 taxable year. The only question before us is whether § 483 of the Internal Revenue Code,[1] which requires that a portion of deferred payments received on account of the sale or exchange of property

1. "§ 483. *Interest on certain deferred payments*

"(a) *Amount constituting interest.*—For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

"(b) *Total unstated interest.*—For purposes of this section, the term 'total unstated interest' means, with respect to a contract for the sale or exchange of property, an amount equal to the excess of—

(1) the sum of the payments to which this section applies which are due under the contract, over

(2) the sum of the present values of such payments and the present values of any interest payments due under the contract.

For purposes of paragraph (2), the present value of a payment shall be determined, as of the date of the sale or exchange, by discounting such payment at the rate, and in the manner, provided in regulations prescribed by the Secretary or his delegate. Such regulations shall provide for discounting on the basis of 6-month brackets and shall provide that the present value of any interest payment due not more than 6 months after the date of the sale or exchange is an amount equal to 100 percent of such payment.

"(c) *Payments to which section applies.*—

(1) *In general.*—Except as provided in subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

(A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and

(B) under which, using a rate provided by regulations prescribed by the Secretary or his delegate for purposes of this subparagraph, there is total unstated interest.

Any rate prescribed for determining whether there is total unstated interest for purposes of subparagraph (B) shall be at least one percentage point lower than the rate prescribed for purposes of subsection (b)(2).

(2) *Treatment of evidence of indebtedness.*—For purposes of this section, an evidence of indebtedness of the purchaser given in consideration for the sale or exchange of property shall not be considered a payment, and any payment due under such evidence of indebtedness shall be treated as due under the contract for the sale or exchange.

"(d) *Payments that are indefinite as to time, liability, or amount.*—In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, this section shall be separately applied to such portion as if it (and any amount of interest attributable to such portion) were the only payments due under the contract; and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made.

"(e) *Change in terms of contract.*—If the liability for, or the amount or due date of, any payment (including interest) under a contract for the sale or exchange of property is changed, the 'total unstated interest' under the contract shall be recomputed and allocated (with adjustment for prior interest (including unstated interest) payments) under regulations prescribed by the Secretary or his delegate.

"(f) *Exceptions and limitations.*—

(1) *Sales price of $3,000 or less.*—This section shall not apply to any payment on account of the sale or exchange of property if it can be determined at the time of such sale or exchange that the sales price cannot exceed $3,000.

(2) *Carrying charges.*—In the case of the purchaser, the tax treatment of amounts paid on account of the sale or exchange of property shall be made without regard to this section if any such amounts are treated under section 163(b) as if they included interest.

(3) *Treatment of seller.*—In the case of the seller, the tax treatment of any amounts received on account of the sale or exchange of property shall be made without regard to this section if all of the gain, if any, on such sale or exchange would be considered as ordinary income.

(4) *Sales or exchanges of patents.*—This section shall not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents).

must be treated as interest rather than capital, applies to a "non-taxable corporate reorganization," see §§ 354(a)(1), 368(a)(1)(B), so as to render part of those shares interest income. The Tax Court held that § 483 was applicable.[2] We affirm.

This dispute—the facts of which have been stipulated—arose out of a transaction in which the Whittaker Corporation acquired 100% control of the Quinn Manufacturing Corporation and of the Detroit Bolt and Nut Company, by exchanging Whittaker shares for the outstanding shares of those two companies, which were held by appellants and by another couple, Mr. and Mrs. Samuel Katkin.[3] Prior to August 19, 1968, appellants and the Katkins owned all of Quinn's outstanding capital stock, each individual owning 25 shares. Detroit's outstanding capital stock was owned by Quinn (300 shares), appellant Mr. Solomon (1,391.5 shares), appellant Mrs. Solomon (931.5 shares), Mr. Katkin (1,522 shares), and Mrs. Katkin (783 shares). On that date, appellants and the Katkins entered into an Acquisition Agreement and Plan of Reorganization with Whittaker, in which they agreed to exchange all of their Quinn and Detroit shares for Whittaker voting stock. Pursuant to that agreement, Mr. Solomon received immediately 6,037 shares of Whittaker's $5 par value preferred stock and 22,890 shares of Whittaker common in exchange for his holdings; Mrs. Solomon received 3,963 shares of Whittaker preferred and 15,027 shares of its common.

In addition, the Agreement stated that because of the difficulty in determining the value of the shares exchanged, Whittaker would transfer additional shares of its common stock to the appellants if the Whittaker common stock they received initially should be retained by them until August 19, 1971, and at that time be worth less than 120% of its value as of August 1968, or if the value of the preferred shares initially received was then below $100 per share. The Agreement set out a formula for determining the precise number of shares to which appellants would in such event be entitled in 1971. During the interim, the maximum number of shares that might be issued to appellants were to be placed in a reserve account to be established by Whittaker, but appellants were not entitled to vote this stock or to receive dividends payable on it. The Agreement made no provision for the payment of interest on the additional shares.

When the shares initially received and retained by appellants failed on August 19, 1971, to reach the values specified in the Agreement, Whittaker on September 27, 1971, issued from the stock held in reserve 29,797 additional shares of its common stock to Mr. Solomon and 19,561 shares to Mrs. Solomon, each share having a value of $10.125.

After the appellants had filed their joint return for the 1971 taxable year, the Commissioner of Internal Revenue, on the basis of § 483, determined a deficiency of $46,492.42 in their income tax for that year, citing their failure to declare any part of the value of the stock they received in 1971 as interest income. On February 25, 1974, appellants filed a petition for redetermination of their deficiency, § 6213, with the Tax Court. In its opinion, as modified after a rehearing, 67 T.C. 379 (1976), that court held that the 1971 transfers of Whittaker

---

(5) *Annuities.*—This section shall not apply to any amount the liability for which depends in whole or in part on the life expectancy of one or more individuals and which constitutes an amount received as an annuity to which section 72 applies."

Unless otherwise stated, all statutory citations in this opinion will be to the Internal Revenue Code of 1954, as amended, 26 U.S.C. §§ 1, *et seq.*

**2.** Since its decision in this case, the Tax Court has reiterated its holding in similar circum-

stances on two occasions, *Alfred H. Catterall, Sr.*, 68 T.C. 413 (1977); *John Cocker, III*, 68 T.C. 544 No. 46 (1977). The Court of Claims reached the same conclusion in *Jeffers v. United States*, 556 F.2d 986 (Ct.Claims 1977).

**3.** The Katkins were parties to proceedings below. They have taken an appeal to the United States Court of Appeals for the Sixth Circuit, *Katkin v. Commissioner*, No. 77–1483, argument of which was set for December 2, 1977.

shares to the Solomons were "payments" to which § 483 applies, and that a portion of those shares should, therefore, have been treated by appellants as interest income on their 1971 return. The court below relied on explicit language in § 483 making the provision applicable to "any payment" meeting specified criteria, Congress' failure to include contingent stock payments in the list of specific exceptions to § 483, legislative history suggesting that the legislature had meant this provision to apply to any deferred payment "for all purposes of the Code," and a Treasury regulation that appears to subject tax-free corporate reorganizations to § 483, see Treas.Reg. § 1.483–1(b)(6), example 7.[4] Judge Goffe's opinion also rejected the Solomons' narrower position to the effect that, even if Congress had meant to apply § 483 to some contingent transfers of stock, their scheme was exempt.[5]

On appeal, the appellants renew three closely related arguments that they made before the Tax Court. They claim (1) that the transfer of stock that occurred in 1971 was not a deferred "payment"; (2) that, if it were deemed to be such a payment, then a conflict would exist between § 483 and

specific Code sections governing the tax treatment of tax-free corporate reorganizations, in which § 483 would have to yield; and (3) that the application of § 483 is inconsistent, in a more general way, with the extension of the benefits of nonrecognition of gain to contingent stock reorganizations.

## DISCUSSION

■ Section 483 provides in pertinent part that in the case of any contract for the sale or exchange of property under which any payment constituting part or all of the sales price is deferred for more than one year after the sale or exchange without providing for payment of any interest or of adequate interest on the deferred payment or payments, a portion of each payment received by the seller more than six months after the date of the sale or exchange shall be treated as unstated interest. Such interest, of course, is treated for tax purposes as ordinary income to the seller. Section 483(c)(2) further provides that an "evidence of indebtedness" (such as a promise to pay) given for property purchased shall not be

4. "*Example (7)*. M Corporation and N Corporation each owns one-half of the stock of O Corporation. On December 31, 1963, pursuant to a reorganization qualifying under section 368(a)(1)(B), M contracts to acquire the one-half interest held by N for an initial distribution on such date of 30,000 shares of M voting stock, and a nonassignable right to receive up to 10,000 additional shares of M's voting stock during the next 3 years, provided the net profits of O Corporation exceed certain amounts specified in the contract. No interest is provided for in the contract. No additional shares are received in 1964 or 1965, but in 1966 the annual earnings of O Corporation exceed the specified amount and on December 31, 1966, an additional 3,000 M voting shares are transferred to N. Section 483 applies to the transfer of the 3,000 M voting shares to N on December 31, 1966." Appellants argue in effect that this regulation is invalid to the extent that it subjects stock received by them in 1971 to taxation. To prevail in their challenge to this Treasury Regulation, appellants would have to show that it is "unreasonable or plainly inconsistent with" the Code itself. *Bingler v. Johnson*, 394 U.S. 741, 750, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969); see *United States v. Correll*, 389 U.S. 299, 88 S.Ct.

445, 19 L.Ed.2d 537 (1967). Clearly, they have not discharged this burden. See Murdoch, Imputed Interest and Section 483, 44 Taxes 866, 872 (1966) ("The Treasury has taken the fair and sensible approach of treating [B or C reorganizations making provision for contingent stock payments] as subject to the provisions of Section 483, but has not treated the interest element in the transaction as destroying the tax-free nature of the exchange."). However, we find it unnecessary to rely upon this regulation in reaching our conclusion in this case.

5. The Tax Court held that § 483 applies to transfers of stock made contingent on the future value of the acquiring company's shares as well as to transfers contingent on the acquired company's earnings, to which the Regulations address themselves specifically. See note 4 *supra*. The court also found that the Solomons could not rely on Rev.Ruling 70–120, 1970–1 C.B. 124, which exempted a scheme in which shares subject to a contingent promise were placed in escrow, since the Solomons—unlike the taxpayers in the Revenue Ruling—had not been entitled to dividends or voting rights while their stock had been in a Whittaker reserve account.

considered a "payment." However, it is clear that the term "payment" may include shares of stock. See Treas.Reg. § 1.483–1(b)(1). Moreover, § 483(d) applies to contingent payments by providing that where any portion of a payment is indefinite as to time, liability or amount at the time of the contract of sale or exchange, these matters (time, liability or amount) shall be determined for purposes of applying the statute at the time when the contingently payable portion is actually paid. In addition, § 483 lists specific exceptions to which it shall not apply (e. g., sales of less than $3,000, sales in which all gain, if any, would be considered ordinary income, sales or exchanges of patents, amounts received as an annuity).

Section 483 was passed in 1964 in order to close a loop-hole that had enabled sellers of property to convert ordinary interest income into capital gain, which is taxable at lower rates.[6] Prior to that time, a taxpayer could agree to sell a capital asset on an installment basis without provision for interest on the deferred payments. By increasing the total amount of the principal payments above the amount that would have been charged for immediate payment, the parties could compensate economically for the absence of a stated rate of interest. Nevertheless, by agreeing not to label any part of a deferred payment as "interest" the seller had been able to report all amounts received on account of the sale as capital gain.

To rectify this situation, the Kennedy Administration proposed that a portion of any deferred payment should be treated as interest, as long as (1) the payment met certain objective criteria, (2) no specific exception was applicable, and (3) either too little or no stated interest had been provided for by the parties to a sales agreement.[7] Before it passed this proposal as § 215 of the Internal Revenue Act of 1964, Congress considered the arguments of many critics who suggested that the proposed solution was much broader than the abuse at which it was directed; these critics contended that many deferred installment payments—particularly contingent payments—contained no hidden interest element even when no interest was stated, since the placement of the risk associated with such transactions made interest inappropriate in an economic sense.[8] Nevertheless, Congress passed § 483 as it had been proposed, making it applicable to "any" deferred payments (on account of the sale or exchange of property) which met certain specified criteria, including contingent payments, see § 483(d); note 1, *supra.*

Thus, Congress opted for a broad, prophylactic approach to the problem of unstated interest, making the operation of § 483 dependent upon certain objectively verifiable circumstances which had usually evidenced a potential for the abuse against which the section was aimed and not on the subjective intent of the parties to a sale. See *Jeffers v. United States,* 556 F.2d 986, 995 (Ct.Cl.1977). Although this approach may have led to the enactment of a statute which, because of its breadth, might encompass within its scope some deferred payments that would not be intended by the parties to include hidden interest, Congress, by creating what amounted to a conclusive

6. H.Rep. No. 749, 88th Cong., 1st Sess. (1963), reprinted in 1964 U.S.Code Cong. & Admin. News, pp. 1380–82; S.Rep. No. 830, 88th Cong., 2d Sess. (1964), reprinted in 1964 U.S. Code Cong. & Admin.News, pp. 1774–77.

7. See President's 1963 Tax Message, along with Principal Statement, Technical Explanation, and Supporting Exhibits and Documents, House Committee on Ways and Means, 88th Cong., 1st Sess. 146–50 (Comm.Print 1963); H.R. 8363, 88th Cong., 1st Sess. § 215 (1963).

8. E. g., 5 Hearings on the Revenue Act of 1963 Before the Senate Committee on Finance, 88th Cong., 1st Sess. 2071–72 (1963) (Statement of the Committee on Taxation of the Association of the Bar of the City of New York); 5 *id.* at 2140 (Statement of the Tax Section of the New York State Bar Association); 5 *id.* at 2261 (Statement of Lincoln Arnold, Chairman, Tax Committee, American Mining Congress); 5 Hearings on the Tax Recommendations of the President Before the House Committee on Ways and Means, 88th Cong., 1st Sess. 2561 (1963) (remarks of Thomas J. Grave, General Chairman, Committee on Taxation, American Institute of Certified Public Accountants).

presumption on the basis of relevant criteria, avoided the insoluble problems that might arise if the IRS were required to probe the minds of the parties to each such transaction in an effort to' determine whether the deferred purchase price had in fact been adjusted upward to reflect an interest charge.

Appellants appear to agree that if the September 27, 1971, transfer of additional Whittaker shares to them constituted a deferred "payment" within the meaning of § 483 and if this characterization does not result in a conflict between § 483 and the provisions governing tax-free reorganizations (Code §§ 354(a)(1), 358(a)(1), 368(a)(1)(B) and 1223(1)), all of the other conditions for application of § 483 are present in this case. The transfer (1) was on account of the sale or exchange of property, (2) constituted part of the sales price for appellants' Quinn and Detroit shares, (3) was due more than six months after the date of the initial exchange, and (4) was made pursuant to a contract under which a payment was due more than one year after this exchange and which provided for no interest. Moreover, the transfer fell into none of the explicit exceptions listed in § 483(f).

However, appellants contend, first, that the issuance of the additional Whittaker shares to them in 1971 pursuant to the 1968 Agreement did not constitute a deferred "payment" as that term is used in § 483. We disagree. Prior to 1971, the Solomons had few of the rights and liabilities normally associated with the ownership of the additional shares. They could neither vote them nor receive dividends payable on them (nor were they liable for taxes on those dividends). Compare Rev.Ruling 70–120, 1970–1 Cum.Bull. 124. While appellants' right to receive these reserve shares in 1971 had been fixed in 1968 subject to certain conditions, the conditional promise to transfer them was not the equivalent of receiving them at that time. It was instead an "evidence of indebtedness" which, as § 483(c)(2) specifically provides, is not a "payment." In short, § 483 declares

itself applicable to "any payment" meeting its explicit qualifications; the transfer of the stock to appellants in 1971, as distinguished from the contingent agreement in 1968, was such a payment covered by the section. The transaction therefore meets the objective criteria of § 483 and, regardless of the parties' intent in the present case, it can hardly be disputed that sellers in appellants' position might well, as part of such a bargain, demand and receive additional shares, albeit on a contingent basis, to compensate them for the dividends and other ownership rights foregone or postponed because of the necessity of waiting three years to ascertain the value of stock being received in exchange.

Appellants attempt to avoid the clear import of the language of § 483 by suggesting that the reorganization provisions of the Code and associated case law fix the character of the exchange of stock between Whittaker and appellants so as to exclude the possibility of a deferred payment of stock. Principal reliance is put on *Carlberg v. United States*, 281 F.2d 507 (8th Cir. 1960), and *James C. Hamrick*, 43 T.C. 21 (1964), which dealt with the question of whether a contingent right to receive stock was consideration "other than stock" ("boot") for the purposes of § 356(a)(1) and § 351(a), respectively. In both of these cases, a taxpayer exchanged property—in *Carlberg* stock, in *Hamrick* a patent—for stock in an acquiring corporation and a conditional right to receive additional stock in the future. In order to avoid recognizing gain on the exchange the taxpayers had to show that the conditional right was not property "other than stock." Both courts held that such a promise was not "other property" and consequently that no gain need be recognized on the transactions at issue in either case. *Carlberg*, in which the acquiring corporation had issued "Certificates of Contingent.Interest" to evidence its conditional obligation to transfer additional shares at a date after the original exchange, stated:

"1. Purpose. . . .

"The Certificates can produce nothing other than stock and nothing other than a

continuity of interest. The Certificates therefore fit the expressed basic purpose of the tax free provisions of the reorganization sections.

\* \* \* \* \* \*

"2. Practicality. . . .

"We emphasize also that, however one may choose to describe it, the Certificate of Contingent Interest represented only International common and nothing else. What the holder possessed was either stock or it was nothing.

\* \* \* \* \* \*

"For these reasons of purpose, practicality, precedent and substance, we hold that the property interest represented by the Certificates of Contingent Interest in this reorganization is 'stock' within the meaning of § 354(a)(1) rather than 'other property' within the meaning of § 356(a)(1) or 'boot' and that the Certificates' receipt by the taxpayer in 1956 did not result in recognized income to her." 281 F.2d at 518–20.

Appellants claim that since their exchange is a tax-free reorganization very similar to that described in *Carlberg*, that case establishes that they received their entire "equity interest" in Whittaker in 1968, and thus that there could have been no deferred payment in 1971 when they received the additional Whittaker shares. However, *Carlberg*,[9] (and *Hamrick*)[10] had nothing to do with whether transfers of rights in stock constitute "payments" for the purposes of § 483. *Carlberg* dealt only with the question of whether the changes in rights that accompanied issuance of the Certificates of Contingent Interest in the acquiring corporation and their subsequent transformation into actual stock interrupted the "continuing interest in property under modified corporate forms" that is the *sine qua non* of a tax-free corporate reorganization. It did not deal with the question of whether the deferred issuance of the shares pursuant to the terms of the Certificates might nevertheless constitute payments under § 483—which had not even been passed when the case was decided. Certainly *Carlberg* never held, as appellants would have us read it, that the holders of the Certificates of Contingent Interest received their entire stock interest in the acquiring company when they acquired these Certificates. The court was careful to avoid such a statement.[11] Indeed, it does not appear that the holders of the Certificates, prior to their deferred receipt of the additional shares, enjoyed any of the indicia of stock ownership, such as dividends, voting rights, or the like. The characterization of appellants' receipt of Whittaker shares in 1971 as a deferred "payment" for the purposes of § 483 would not, therefore, necessarily result in a conflict between § 483 and *Carlberg* or *Hamrick*. Absent such a conflict, there is no reason to give the term "payment" the strained interpretation

---

**9.** The Tax Court did not explicitly deal with *Carlberg* in its opinion in this case, although it has since indicated its approval of the *Jeffers* court's discussion of it. *Alfred H. Catterall, Sr.*, 68 T.C. 413, 419 (1977).

We note that the appellants have taken the not unusual position that the majority of the *Jeffers* court and the Tax Court did not *really* consider appellants' argument that no deferred payment occurred here. This is not the case. Both courts plainly held that performance of a contingent promise to transfer stock is a "payment" that takes place when the promise is actually performed. Since there was no doubt in either *Jeffers* or this case that the taxpayers had received their shares more than six months after the underlying sale or exchange had occurred, § 483 was applied. The failure of the Court of Claims and Tax Court to use the term "deferred," which appears nowhere in the stat-ute, does not make this argument one of first impression.

**10.** Because *Hamrick* merely followed *Carlberg* on the point that is of interest to us here, we will restrict our discussion in the text to *Carlberg*. Our discussion is equally applicable to *Hamrick*.

**11.** The *Carlberg* court did state, "What the holder possessed was either stock or it was nothing." 281 F.2d at 519. However, the context for this statement indicates clearly that the court was using "stock" in a general sense as referring to an equity interest rather than to actual shares—with all of their concomitant rights—since the court followed this language with a qualification, saying, "The number of shares to be forthcoming, it is true, was not determined with exactitude at the time of the merger."

urged by appellants or to limit the applicability of a provision Congress apparently intended to cover all transactions meeting its express criteria.

Appellants' next contention is that characterization of the 1971 transfer as a deferred "payment" would bring § 483 into conflict with Code provisions governing tax-free corporate reorganizations. We can find no such inconsistency.

On a narrow level, § 483 does not conflict with the provisions governing corporate reorganizations when both are applied to a corporate reorganization like the one before us. First, § 354(a)(1) provides that "[n]o gain shall be recognized" in such circumstances, but application of § 483 does not result in the recognition of any "gain" as the term is defined in § 1001(a).[12] Gain and interest are separate elements of gross income, see § 61(a)(3)–(4); *Alfred H. Catterall, Sr.*, 68 T.C. 413, 420–21 (1977), so interest may be imputed without gain being recognized.

Second, § 1223(1), which governs the computation of the "holding period" of shares received in a tax-free reorganization, provides:

"(1) In determining the period for which the taxpayer has held property received in an exchange, there shall be included the period for which he held the property exchanged if, under this chapter, the property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property ex-

changed, and, in the case of such exchanges after March 1, 1954, the property exchanged at the time of such exchange was a capital asset as defined in section 1221 or property described in section 1231."

Appellants point out that under the circumstances of this case, the Whittaker shares they "received in . . . exchange" for their Quinn and Detroit shares will be deemed to have been held at least from the time they first acquired their Quinn and Detroit shares. Thus, they argue, a conflict would arise if they were held to have received any of their Whittaker shares in the form of a "payment" made in 1971, some three years after they transferred title to their Detroit and Quinn shares. We disagree. When applied to the facts of this case, § 1223 itself recognizes that an "exchange" of Whittaker shares for Detroit and Quinn shares has taken place and that these Detroit and Quinn shares were held for some period before they were exchanged. Accordingly, § 1223 does not require us to conclude for all purposes of the Code that appellants were paid their Whittaker shares before they even entered an agreement to obtain this stock. Rather, § 1223 only fixes the holding period of those shares "received in an exchange" for the purposes of certain specific Code provisions—the most important being § 1222, which distinguishes between short- and long-term capital gain or loss.[13] In this regard, § 1223 does not preclude us from drawing a distinction between (1) those Whittaker shares received by appellants in

---

12. "(a) *Computation of gain or loss.*—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized."

13. Although the legislative history is barren of any mention of Congress' understanding of the effect of § 483 on tax-free corporate reorganizations, it does contain a suggestion that Congress foresaw § 483's application to exchanges in which no gain would be recognized. H.Rep. No. 749, 88th Cong., 1st Sess. (1963), reprinted in 1964 Code Cong. & Admin.News, pp. 1512–

13, commented on § 483(f)(3) as it existed then as follows:

"Treatment of seller

"Paragraph (3) of section 483(f) excepts, in the case of the seller, amounts received on account of the sale or exchange of property from the tax treatment provided under section 483, if no part of any gain on such sale or exchange would be considered as gain from the sale or exchange of a capital asset or property described in section 1231 of the code. *The determination of whether this exception applies is made without regard to whether*, in fact, the sale or exchange results in a gain or *whether the gain (if any) would be recognized*, or whether section 1245 or section 1250 of the code applies to some or all of the gain (if any)." [Emphasis supplied]

1971 as a capital asset, i. e., as principal, in exchange for Detroit and Quinn shares, and (2) the portion of the Whittaker shares received in 1971 which is deemed to be "interest" on the deferred transfer in 1971. With respect to the second category, we agree with the Tax Court's conclusion in *John Cocker, III,* 68 T.C. 544, 554 No. 46 (1977), that the portion of a deferred payment that is deemed under § 483 to be interest is not property received in an exchange. Consequently, the holding period of this portion of appellants' shares will run only from the time that they received these shares, i. e., 1971.[14] So viewed, § 1223 does not conflict with § 483.

More broadly, we agree with the Commissioner that the purpose of § 483 does not conflict with the purpose underlying the Code's corporate reorganization provisions. The purpose of the latter is summarized in Treas.Reg. § 1.368–1(b), as follows:[15]

"(b) *Purpose.* Under the general rule, upon the exchange of property, gain or loss must be accounted for if the new property differs in a material particular, either in kind or in extent, from the old property. The purpose of the reorganization provisions of the Code is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms."

The purpose of § 483, on the other hand, is to end an abuse whereby ordinary interest income was being converted into capital gain; the legislative history indicates that Congress intended its solution to encompass all transactions with certain objective characteristics, whether or not they were consciously designed to avoid taxes. The transaction before us may be taxed so as to give effect to both of these purposes and without any eventual tax overlap. A finding that this transaction constituted only "a readjustment of continuing interest in property under modified corporate forms" does not foreclose implementation of Congress' prophylactic solution to the problem of unstated interest. Taxation of the interest portion does not conflict with maintenance of the tax-free status of the portion received in an exchange of capital assets.

Because there is no conflict between § 483 and the provisions governing tax-free reorganizations, *Fox v. United States,* 510 F.2d 1330 (3d Cir. 1975), upon which appel-

---

§ 483(f)(3) has since been amended, Pub.L. 94–455, Title XIX, § 1901(b)(3)(B), 90 Stat. 1792 (1976), but that amendment was purely technical in nature and did not affect the applicability of § 483 to transactions in which no gain is recognized.

Congress' apparent understanding that § 483 would apply to transactions in which no gain was recognized refutes appellants' argument that § 483 would come into conflict with § 1223 if interest were imputed in this case. In all cases in which property is exchanged and no gain is recognized, the holding period of the acquired property extends back to before the time of the exchange, see § 1223. If this alone were sufficient to bar the applicability of § 483, Congress could not have said that § 483 would apply to transactions in which gain was realized but not recognized. Appellants must, therefore, be mistaken in their view of the "holding period" provision.

**14.** Severing the interest and principal in this transaction also disposes of appellants' claim that application of § 483 in this case would conflict with § 358(a)(1), which would operate in this case to assign the "basis" of appellants'

Quinn and Detroit shares to the Whittaker shares which they were "permitted [to receive] without the recognition of gain or loss." Because the shares to be treated as interest are severable from the amounts of the Whittaker stock received which constitute principal, the shares deemed to be interest are not property received in the exchange and need not be assigned a "carry-over basis" under § 358(a)(1). When the transaction is treated in this way, no conflict arises between § 483 and § 358.

**15.** We have not been referred to any legislative history suggesting that Congress' purpose in enacting the reorganization provisions was any different than that stated in this regulation. Accordingly, we reject appellants' position in Point III of their brief to the effect that application of § 483 in the circumstances of this case would contradict a policy—supposedly recognized by the courts—in favor of allowing taxpayers to cope with valuation problems associated with exchanges of stock by making use of deferred contingent payments without fear of any adverse tax consequences.

38

lants rely so heavily, is inapposite. In *Fox*, an ex-husband who had agreed to pay his ex-wife a sum of money in installments over a nine-and-a-half-year period without provision for interest sought to invoke § 483 to impute interest that he could *deduct* on his return. The *Fox* court found that allowance of such a deduction would conflict with specific Code provisions excluding the full amount of the installments from the ex-wife's gross income, see §§ 71(a), 71(c), and correlatively making them non-deductible as to the ex-husband, § 215. Consequently, it held that § 483 contained an implicit exception for such installment payments. Because we find no comparable conflict in this case, we need not qualify § 483 here.

In conclusion, we hold that the issuance of Whittaker shares to the appellants on September 27, 1971, was a "payment" within the meaning of § 483. Because all the other conditions for the operation of § 483 are concededly present, appellants were required to declare a portion of that payment as interest in accordance with the applicable Treasury Regulations.

The judgment of the Tax Court is affirmed.