Jerrold L. KINGSLEY and June H.
Kingsley, Petitioner-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent-Appellee.

No. 79–7662.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 9, 1981.

Decided Nov. 4, 1981.

Eugene J. Brenner, Janin, Morgan & Brenner, San Francisco, Cal., for petitioners-appellants.

Gary R. Allen, Washington, D. C. (argued), for respondent-appellee; Gilbert E. Andrews, Washington, D. C., on brief.

Before GOODWIN, SKOPIL, and REINHARDT, Circuit Judges.

SKOPIL, Circuit Judge:

Taxpayers appeal from a decision of the Tax Court holding that they must pay tax on interest income imputed under I.R.C. § 483 on the deferred delivery of stock in a corporate reorganization. Gain on the shares transferred in the reorganization was not recognized under I.R.C. §§ 354, 368. Taxpayers argue on appeal that section 483 may not be applied to a section 354 reorganization, that section 483 by its own terms does not apply to the present case, and that the Tax Court improperly calculated the interest on the deferred stock. We affirm.

## FACTS

There is no material dispute regarding the facts. Jerrold Kingsley was sole shareholder of Household Research Institute (HRI). On October 31, 1966, he entered into a reorganization agreement with American Home Products (American), to convey all the stock of HRI in return for 17,845 shares of American common stock. The agreement contained warranties by Kingsley regarding HRI's financial statements, tax liabilities, and insurance claims, and provided that 2,775 shares of American stock would be withheld as security for performance of these warranties. The retained shares would be delivered upon the later of: (1) a final IRS audit of HRI's tax return; or (2) the passage of three years. If there were valid claims under the warranties, the number of shares to be delivered would be reduced to satisfy the claims at an agreed-upon value of $81 per share. Kingsley could not vote the retained shares

and would not receive cash dividends, but the dividends on the shares would be applied to purchase additional shares at a rate of $81 per share. In the event of any stock split, the number of retained shares would be adjusted accordingly. The agreement contained no provision for payment of interest on the value of the retained stock.

There were no claims under the warranties and American delivered 6,153 shares to Kingsley on April 1, 1970. Those shares represented 5,550 retained shares (after a two-for-one split) and 603 shares in lieu of dividends. The shares consisted of Treasury stock, and had not been outstanding prior to their delivery to Kingsley. Kingsley did not report and pay tax on the value of the dividend shares. The Commissioner issued Kingsley a notice of deficiency of $36,306 for 1970 on the basis that interest income must be imputed to Kingsley under I.R.C. § 483.

The amount of imputed interest was calculated from the fair market value of the stock in 1970, $64.875 per share, rather than the stipulated value in the agreement, $40.50 per share (after the stock split).

Kingsley contested the deficiency in the Tax Court, which upheld the Commissioner. *Kingsley v. Commissioner*, 72 T.C. 1095 (1979).

## STATUTORY FRAMEWORK

The parties stipulate that the transaction is a qualifying "reorganization" under I.R.C. § 368(a)(1)(B).[1] Under section 354(a)(1), no gain or loss is recognized in such a reorganization.

Section 483 requires that interest be imputed in certain installment sales where the parties have failed to make any provision for the payment of interest. The statute was enacted to prevent a seller of property from converting ordinary interest income into capital gain, taxable at lower rates. Before section 483 was enacted, no interest income was recognized in an installment sale unless the contract so provided. Thus, the parties could tacitly provide for interest on the deferred payments by raising the

---

[1] All statutory references are to the Internal Revenue Code, Title 26, United States Code.

sale price, and enable the seller to report that increase as capital gain rather than interest income by not labelling the increase as interest. *See* H.R.Rep.No.749, 88th Cong., 1st Sess. (1963), *reprinted in* [1964]

U.S.Code Cong. & Ad.News, 1313, 1380–83; *Solomon v. Commissioner*, 570 F.2d 28, 33 (2d Cir. 1977).

Section 483(c)(1)[2] provides that interest income must be imputed to the seller on

**2.** The full text of section 483 is set forth below:

(a) Amount constituting interest.—For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

(b) Total unstated interest.—For purposes of this section, the term "total unstated interest" means, with respect to a contract for the sale or exchange of property, an amount equal to the excess of—

(1) the sum of the payments to which this section applies which are due under the contract, over

(2) the sum of the present values of such payments and the present values of any interest payments due under the contract. For purposes of paragraph (2), the present value of payment shall be determined, as of the date of the sale or exchange, by discounting such payment at the rate, and in the manner, provided in regulations prescribed by the Secretary. Such regulations shall provide for discounting on the basis of 6-month brackets and shall provide that the present value of any interest payment due not more than 6 months after the date of the sale or exchange is an amount equal to 100 percent of such payment.

(c) Payments to which section applies.—

(1) In general.—Except as provided in subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

(A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and

(B) under which, using a rate provided by regulations prescribed by the Secretary for purposes of this subparagraph, there is total unstated interest.

Any rate prescribed for determining whether there is total unstated interest for purposes of subparagraph (B) shall be at least one percentage point lower than the rate prescribed for purposes of subsection (b)(2).

(2) Treatment of evidence of indebtedness. —For purposes of this section, an evidence of indebtedness of the purchaser given in

consideration for the sale or exchange of property shall not be considered a payment, and any payment due under such evidence of indebtedness shall be treated as due under the contract for the sale or exchange.

(d) Payments that are indefinite as to time, liability, or amount.—In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, this section shall be separately applied to such portion as if it (and any amount of interest attributable to such portion) were the only payments due under the contract and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made.

(e) Change in terms of contract.—If the liability for, or the amount or due date of, any payment (including interest) under a contract for the sale or exchange of property is changed, the "total unstated interest" under the contract shall be recomputed and allocated (with adjustment for prior interest (including unstated interest) payments) under regulations prescribed by the Secretary.

(f) Exceptions and limitations.—

(1) Sales price of $3,000 or less.—This section shall not apply to any payment on account of the sale or exchange of property if it can be determined at the time of such sale or exchange that the sales price cannot exceed $3,000.

(2) Carrying charges.—In the case of the purchaser, the tax treatment of amounts paid on account of the sale or exchange of property shall be made without regard to this section if any such amounts are treated under section 163(b) as if they included interest.

(3) Treatment of seller.—In the case of the seller, the tax treatment of any amounts received on account of the sale or exchange of property shall be made without regard to this section if all of the gain, if any, on such sale or exchange would be considered as ordinary income.

(4) Sales or exchanges of patents.—This section shall not apply to any payments made pursuant to a transfer described in section 1235(a) (relating to sale or exchange of patents).

(5) Annuities.—This section shall not apply to any amount the liability for which depends in whole or in part on the life expectancy of one or more individuals and

"any payment on account of the sale or exchange of property" that is due more than six months after the sale under a contract that provides that at least one of the payments is due a year or more after the sale and that does not provide for adequate interest payments. The giving of a promissory note or other evidence of indebtedness does not constitute immediate payment; the payments are deemed due for the purpose of section 483 when they are due under the promissory note or contract. I.R.C. § 483(c)(2). Where it is not possible to determine from a contract the exact date each payment is to be made, the amount and date of each payment shall be determined at the time the payment is made. I.R.C. § 483(d).

Section 483, which was enacted after the tax-free reorganization provisions (I.R.C. §§ 354–374), does not expressly state whether it applies to the deferred delivery of stock in such a reorganization. The statute does provide that no interest income may be imputed where any gain to the seller would be taxed at ordinary income rates. I.R.C. § 483(f)(3).

which constitutes an amount received as an annuity to which section 72 applies.

3. Treas.Reg. § 1.483–1(b)(6) example (7) provides:

M Corporation and N Corporation each own one-half of the stock of O Corporation. On December 31, 1963, pursuant to a reorganization qualifying under section 368(a)(1)(B), M contracts to acquire the one-half interest held by N for an initial distribution on such date of 30,000 shares of M voting stock, and nonassignable right to receive up to 10,000 additional shares of M's voting stock during the next 3 years, provided the net profits of O Corporation exceed certain amounts specified in the contract. No interest is provided for in the contract. No additional shares are received in 1964 or in 1965, but in 1966 the annual earnings of O Corporation exceed the specified amount and on December 31, 1966, an additional 3,000 M voting shares are transferred to N. Section 483 applies to the transfer of the 3,000 M voting shares to N on December 31, 1966. See example (2) of paragraph (e)(3) of this section for an illustration of the computation of total unstated interest in this case.

4. Treas.Reg. § 1.483–1(b)(6) example (8) provides:

The regulations, however, clearly state that section 483 does apply to the deferred transfer of stock in a tax-free reorganization:

[T]he provisions of section 483 apply to deferred payments of stock or securities by a corporation which is a party to a reorganization, notwithstanding that under section 354(a) no gain or loss is recognized on the transaction.

Treas.Reg. § 1.483–2(b)(3). Example (7) in Treas.Reg. § 1.483–1(b)(6) specifically states that section 483 applies to a 368(a)(1)(B) reorganization, the type of transaction involved here.[3] The regulations also provide, however, that section 483 does not apply where shares are immediately transferred to a third-party escrow in the course of a section 368(a)(1)(B) reorganization.[4]

## DISCUSSION

### I

### Validity of Regulations

■ Kingsley's primary argument is that the application of section 483 to the present

P Corporation and Q Corporation each owns one-half of the stock of R Corporation. On December 31, 1963, pursuant to a reorganization qualifying under section 368(a)(1)(B), P contracts to acquire the one-half interest held by Q for a distribution on such date of 40,000 shares of P voting stock. As a part of the plan of reorganization, Q immediately places 10,000 of such voting shares in escrow. The escrow agreement provides that all or a portion of the stock placed in escrow is to be returned to P within 3 years (together with dividends and earnings thereon) if R's net profits do not exceed certain amounts specified in the agreement and that Q Corporation is entitled to vote the escrowed stock until such time as it may be returned to P Corporation. The agreement further provides that the escrow will terminate at the end of 3 years and that any stock then remaining in escrow (together with dividends and earnings thereon) is to be redelivered to Q Corporation. Q Corporation currently includes in income all dividends and earnings thereon with respect to the escrowed stock. Since Q Corporation is treated as having received, on December 31, 1963, all payments due under the exchange, section 483 does not apply to the transfer of any of the escrowed stock to Q Corporation.

transaction conflicts with the intent of Congress. Because it is evident that the deferred payment of stock in the present case is subject to section 483 under Treas.Reg. §§ 1–483–1(b)(6) example (7), 1–483–2(b)(3)(i), Kingsley must demonstrate that these regulations are invalid.[5] This is a difficult burden to carry because treasury regulations must be sustained "unless unreasonable and plainly inconsistent with the revenue statutes." *See Bingler v. Johnson*, 394 U.S. 741, 749–51, 89 S.Ct. 1439, 1444–45, 22 L.Ed.2d 695 (1969); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948).

A. Conflict with the Tax-free Provision of Section 354

■ Kingsley first argues that the regulations are invalid because application of section 483 to a corporate reorganization qualifying under section 354 directly conflicts with the provision in section 354 that no tax be paid in such a reorganization. Section 354 should control over section 483, he argues, because it is the more specific statute.

This argument has been rejected by three circuits and the Court of Claims. *See Vorbleski v. Commissioner*, 589 F.2d 123, 130–35 (3d Cir. 1978); *Katkin v. Commissioner*, 570 F.2d 139, 143–44 (6th Cir. 1978); *Solomon v. Commissioner*, 570 F.2d 28, 36–38 (2d Cir. 1977); *Jeffers v. United States*, 556 F.2d 986, 991–95 (Ct.Cl.1977). We agree with these courts that there is no conflict between section 483 and the tax-free reorganization provision.

First, we note that section 483(c)(1) provides that the statute applies to "any payment on the account of the sale or exchange of property." Although section 483 was enacted after sections 354–374 and Congress must be deemed to have been aware of those statutes, there is no exception in

section 483 for section 354 reorganizations. *See Jeffers*, 556 F.2d at 993–94; *Katkin*, 570 F.2d at 143; *Vorbleski*, 589 F.2d at 134.

Second, the legislative history suggests that Congress did not intend to create an exception for tax-free reorganizations. Section 483(f)(3) provides that no interest will be imputed where any gain to seller would be treated as ordinary income. A House report states that "the determination whether this exception applies is made without regard to whether, in fact, the sale or exchange results in a gain or whether the gain (if any) would be recognized." H.Rep.No.749, 88th Cong., 1st Sess. (1963), *reprinted in* [1964] U.S.Code Cong. & Ad. News 1512–13. Although this statement does not relate directly to section 354 reorganizations, it does indicate that Congress expected that there would be no exception to section 483 merely because any gain on the transaction would not be recognized. *See Solomon*, 570 F.2d at 36–37 n.13.

Third, section 354 was intended only to prevent the taxation of *gain* on transactions "which effect only a readjustment of continuing interest in property under modified corporate forms." *See* Treas.Reg. § 1–368–1(b). There is a clear distinction in the revenue laws between gain and ordinary income. We conclude that taxation of ordinary interest income on the deferred delivery of stock in a section 354 reorganization does not conflict with the purpose of section 354. *See Solomon*, 570 F.2d at 36–38; *Vorbleski*, 589 F.2d at 132.

B. No Potential for the Abuses Section 483 Was Intended to Eliminate

■ Kingsley next argues that section 483 should not apply to the present case because the transaction does not present the evils that Congress was concerned with when it enacted the statute. He contends that the legislative history reveals that sec-

---

5. Kingsley contends that the present case is unlike example (7) because the contingency in that example (the profits of Corporation O exceeding a certain amount) is unlike the contingency here (a favorable final tax audit for the passage of three years). For the reasons we discuss in Part I, C, *infra*, we do not agree.

This transaction would not be covered by section 483 if it comes within example (8) of Treas.Reg. § 1–483–1(b)(6). We conclude in part II of this opinion, however, that the present case is not analogous to example (8) because there was no transfer to a third party escrow holder.

tion 483 was enacted to prevent parties from converting any part of a payment that in an economic sense constitutes interest into capital gain, taxable at a preferential rate. To support this contention Kingsley relies upon House and Senate reports that describe the need for the statute through an example involving deferred cash payments. *See* H.R.Rep.No.749, 88th Cong., 1st Sess. (1963), *reprinted in* [1964] U.S. Code Cong. & Ad.News 1380–81.

Kingsley contends that the deferral of the delivery of the stock in the present case does not justify interest in a economic sense, because American did not have economic use of the stock while delivery was deferred in the same sense that the purchaser has use of the amount deferred in an installment cash sale. Deferred payment in a cash sale allows the purchaser to loan at interest the amount deferred, or saves him the interest he would have to pay to borrow the amount deferred. In contrast, Kingsley argues, American was not able to derive any economic benefit from the deferral of the delivery of the stock. It could not loan the stock for profit as could the holder of cash. Moreover, he had immediate economic use of the stock, Kingsley argues, because he was entitled to the dividends earned pending delivery.

Kingsley further contends that section 483 should not apply because there was no intent to convert interest income to capital gain by hiding interest payments in the purchase price. Delivery of the stock was delayed, he argues, solely to secure performance of the warranties, not to enable American to have continuing economic use of the stock. Section 483, he concludes, was enacted to prevent manipulation of the revenue laws; it was not intended to apply to genuine security agreements.

These arguments are unpersuasive. Section 483 is not limited to cash sales or those in which the parties have raised the purchase price to compensate for deferred payment. It applies to "any payment on account of the sale or exchange of property." When the bill was introduced, several critics pointed out at the hearings that the language was very broad and might be construed to apply to deferred payments in which there was no hidden interest element in an economic sense. These critics specifically suggested that no interest should be imputed on contingent payments, such as those involved here, and noted that such payments would be covered unless the statute was amended. 5 Hearings on the Revenue Act of 1963 Before the Senate Committee on Finance, 88th Cong., 1st Sess. at 2140, 2261. Congress nonetheless passed the statute as originally proposed. This suggests that Congress desired a broad rule applicable to deferred payments of all kinds without a showing that the parties had raised the price to reflect hidden interest charges. *See Solomon,* 570 F.2d at 33–34; *Vorbleski,* 589 F.2d at 134–35. We note that the regulations provide a "safe harbor" enabling the seller to avoid imputed interest income where stock is retained as a security device in a corporate reorganization. Section 483 does not apply where the shares are placed in a formal third party escrow. *See* Treas.Reg. § 1–483–1(b)(6) example (8).[6]

Kingsley finally argues that this transaction falls outside the intended scope of section 483 because there is no possibility of converting interest income to capital gains. This is so, he contends, because no gain is recognized on the transaction pursuant to section 354. We do not agree.

Nonrecognition means only that taxation of the gain is deferred, not that it will not be taxed at preferential rates. Deferral of taxation through nonrecognition actually compounds the tax avoidance possible through converting interest income to capital gain.

C. No Deferred Payments

■ Kingsley next argues that section 483 does not apply by its own terms because

---

**6.** See discussion of escrow exception in Part II of this opinion. The text of example (8) is set forth in footnote 4, *supra.*

there were no deferred payments in the present case. He notes that he earned dividends on the retained shares and that he had a fixed right to receive the retained shares in 1970. Urging that the court recognize the substance of the transaction over its form, Kingsley argues that the payments were complete in 1967 for the purpose of section 483 because he had equitable ownership of the stock at that time.

Kingsley attempts to distinguish the cases in which other courts have held that section 483 applies to the deferred delivery of stocks in a tax-free reorganization. He argues that because there was a condition precedent to delivery of the retained stock in each of those cases, the seller did not have a fixed right to receive the stock and therefore did not have equitable ownership.

This argument is unpersuasive. What Kingsley calls equitable ownership is nothing more than the right to receive the stock in the future. This is essentially no different from the right to receive money at a specified time in the future under an installment sale. We conclude that this "equitable ownership" is essentially only an evidence of indebtedness, which does not constitute immediate payment under section 483(c)(2). *See Jeffers*, 556 F.2d at 997; *Solomon*, 570 F.2d at 34; *Vorbleski*, 589 F.2d at 128.

Kingsley's argument that the prior cases are distinguishable because the future delivery of the stock in those cases was subject to a condition precedent is unavailing. This distinction is not material because, as noted above, even an unconditional right to receive stocks in the future is merely an evidence of indebtedness that does not constitute immediate payment.

Kingsley also relies upon cases holding that a right to receive stock in the future is "stock" for the purpose of qualifying a corporate reorganization under section 354. Under section 354, gain is unrecognized only if the seller receives no consideration other than stock. *See Carlberg v. United States*, 281 F.2d 507 (8th Cir. 1960); *Hamrick v. Commissioner*, 43 T.C. 21 (1964).

Kingsley contends that the interest income imputed under section 483 would constitute "boot" disqualifying the transition under section 354. Because the Commissioner has stipulated that this transaction does qualify under section 354, he argues, there is necessarily no imputed interest "boot" under section 483.

■ We agree with the other courts that have held that interest income imputed under section 483 is not "boot" inconsistent with a section 354 reorganization. We believe that *Carlberg* and *Hamrick* were concerned solely with the type of property that was exchanged, not whether some of that property should be characterized as interest because of the timing of the exchange. *See Jeffers*, 556 F.2d at 996; *Solomon*, 570 F.2d at 35; *Katkin*, 570 F.2d at 142–43; *Vorbleski*, 589 F.2d 129–30. We also note that Treas.Reg. § 1–483–1(b)(6) examples (7), (8) indicate clearly that a reorganization will not be disqualified from nonrecognition of gain under section 354 merely because interest is imputed under section 483.

## II

### Escrow Exception

■ Kingsley next attempts to demonstrate that section 483 does not apply even if the existing regulations are valid. He argues that American's retention of stock as security for the performance of the warranties was the functional equivalent of an escrow. The regulations provide that no interest may be imputed under section 483 where the purchaser transfers the full consideration to a third party escrow holder within one year of the sale or exchange. Treas.Reg. § 1–483–1(b)(6) example (8).[7]

This argument is unpersuasive. The logic of section 483 is that interest must be included whenever the purchaser of property retains part of the agreed-upon consideration for more than one year. *See Solomon*, 570 F.2d at 33–34. Section 483 does not apply where stock is delivered to a third party escrow holder because the purchaser

---

**7.** Example (8) is reproduced in footnote 4, *supra*.

does not retain the stock. Although the payment is deferred in the sense that the stock is not delivered immediately to the seller, the buyer has delivered the stock to a third party and has lost the use of the stock as surely as if it had been delivered to the seller. In such a case there is no economic basis for the purchaser to pay interest to the seller.

Although the present case is like the escrow example in that delivery of the stock is delayed as security for performance of the agreement, it differs in that the purchaser did not transfer the stock to a third party. Because we believe transfer by the purchaser is the key distinction between example (8) and the examples in which the regulations state that section 483 does apply, we conclude that the present case is not analogous to example (8).

### III

### Value of Stock

■ Kingsley contends finally that the Tax Court erred in calculating the amount of interest to be imputed. The amount of interest depends upon the amount of the deferred payment. Kingsley argues that the amount of the payment must be calculated from the agreed-upon price in the reorganization agreement, $40.50 per share (after the stock split). The Tax Court used the fair market value at the time the shares were delivered in 1970, $64.875 per share.

Section 483(d) provides that where the exact date a payment is due cannot be determined at the time of the sale or exchange, the amount of the payment shall be calculated at the time the payment is actually made. The Fifth Circuit has held that where such a payment is not in cash, the amount of the payment is the fair market value at the time of the payment. *See Caruth v. United States*, 566 F.2d 901, 905–06 (5th Cir. 1978).

Kingsley does not argue that the time of payment is not indefinite or that the Tax Court's determination of fair market value is incorrect. Instead, he argues that section 483(d) does not apply because the delivery

of the shares constituted no more than a release of a security interest, which is not an event justifying recognition of the increase in the value of the shares. We do not agree.

Kingsley argues in essence that the stock may not be valued at the time of delivery in 1970 for the purpose of calculating the amount of interest due under section 483, because it would not be valued at that time for the purpose of calculating any gain. The regulations expressly refute this argument:

> [I]f at the time of the sale or exchange, some or all of the payments under the contract are indefinite, the ... computation of the amount of total unstated interest ... shall be made separately with respect to each indefinite payment as of the time it is received .... The provisions of this subparagraph shall apply notwithstanding the fact that the obligation under which such payment is made has been valued and the transaction treated as "closed" for purposes of determining gain or loss.

Treas.Reg. § 1–483–1(e)(1). Kingsley does not contest the validity of this regulation.

AFFIRMED.