ESTATE OF THOMAS L. BATEMAN, DECEASED, RIGGS NATIONAL BANK AND BEULAH L. BATEMAN, CO-EXECUTORS, AND BEULAH L. BATEMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Bateman v. Commissioner
Docket No. 8613-80.
United States Tax Court
T.C. Memo 1983-400; 1983 Tax Ct. Memo LEXIS 382; 46 T.C.M. (CCH) 702; T.C.M. (RIA) 83400; July 13, 1983. Sherin V. Reynolds, for the petitioners. Sara M. Coe, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in income tax of decedent Thomas L. Bateman [1] and petitioner Beulah L. Bateman for the taxable year 1973 in the amount of $30,238.88. The issues for decision are as follows: (1) Whether the payment of $61,860 to decedent Thomas L. Bateman by the former majority shareholder of the corporation *384 employing him was a nontaxable gift or represented gross income; and (2) whether the assessment of the deficiency asserted in the notice of deficiency is barred by the statute of limitations provided under section 6501. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Thomas L. Bateman (decedent) and petitioner Beulah L. Bateman were husband and wife and resided in Bethesda, Maryland, at the time of the filing of the petition in this case. Decedent and Mrs. Bateman filed a joint Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center, Andover, Massachusetts. The decedent, as of the time of the trial of the instant case, had been employed for 33 years in various capacities in the insurance industry. Decedent in his career in the insurance business had been the president of two insurance companies. Decedent, as of the time of the trial, was employed by Participating Annuity Life Insurance Company (PALIC), which sells policies of life insurance known *385 as "variable annuity" policies. Decedent's involvement in PALIC came about through his acquaintance with an individual named John D. Marsh. Decedent first met Mr. Marsh in 1962 when decedent was employed as the chief executive officer of a life insurance company. At that time, Mr. Marsh already had acquired a reputation in the life insurance industry as a highly successful entrepreneur. Mr. Marsh had pioneered in the field of variable annuity life insurance by founding a company called Variable Annuity Life Insurance Company of America (VALIC). At the time of the meeting between decedent and Mr. Marsh, there were only three variable annuity companies in the country: (1) VALIC, (2) the company which employed decedent, and (3) PALIC. Over the next several years Mr. Marsh, who was then the president of VALIC, attempted to get decedent to work for him at VALIC. Mr. Marsh, in late December of 1965 or early 1966, retired from VALIC. However, on March 25, 1966, he purchased a controlling interest in PALIC and became chairman of its executive committee. Shortly after his purchase of a controlling interest in PALIC, Mr. Marsh again contacted decedent and offered him employment with *386 PALIC. Decedent accepted Mr. Marsh's offer to join him at PALIC. Upon joining PALIC, decedent's initial function was to assist in moving the headquarters office of PALIC from Little Rock, Arkansas, to Virginia. Decedent was placed in charge of sales for PALIC, and in such capacity worked for several months for only his expenses as the company was starting its business operations. In July 1966, decedent moved his family from Iowa to Virginia and incurred several thousand dollars in moving expenses. Decedent was not reimbursed for such moving expenses. In October 1966, decedent purchased from Mr. Marsh 2,981 shares of PALIC at a price of $6.73 per share. Mr. Marsh also sold small amounts of his stock to other key employees in mid-1966 in order to attract them to work for his company. In two memorandums dated November 11, 1966, and January 9, 1968, Mr. Marsh specified the compensation arrangement under which PALIC employed decedent. Under both arrangements, decedent was to receive a yearly salary of $20,000 payable monthly. Additionally, decedent was to receive as incentive compensation certain percentages of the annual premiums income from all business of PALIC involving *387 annuity contracts under annuity purchase plans adopted by various public school systems and other tax exempt charitable or educational organizations. The amount of such incentive payments was solely in the discretion of PALIC. A calculation of the amount of such incentive compensation earned by decedent was to be made at the end of each calendar quarter and, at the option of PALIC, might be advanced to decedent. At the end of a calendar year, as soon as the calculation of the amount of incentive compensation earned by decedent for that year was completed, any incentive compensation not previously advanced to decedent was to be paid to him. The January 9, 1968, memorandum from Mr. Marsh, however, placed a $60,000 ceiling on the total compensation, salary and incentive compensation, which could be received by decedent for any calendar year. To the extent that any incentive amounts exceeded this $60,000 ceiling, such excess was to be carried over to the following calendar year as a credit to be made in calculating decedent's incentive compensation for such following year. In the middle of 1966, Mr. Marsh concluded that PALIC needed to obtain additional capital if it were to fully *388 realize its potential. Mr. Marsh wanted to have PALIC expand its sales of insurance into California. However, California required that a variable life insurance company have minimum capital and surplus of $16 million. In an effort to obtain such capital for PALIC, Mr. Marsh entered into negotiations with Aetna Life & Casualty Company of Hartford, Connecticut (Aetna). Mr. Marsh in a memorandum dated February 17, 1967, informed the other shareholders of PALIC of the status of his negotiations with Aetna. The memorandum summarized the basic terms of the tentative agreement between him and Aetna. A key part of the plan then under negotiation was that Aetna would purchase all the outstanding shares of PALIC, other than those belonging to Mr. Marsh, for a price of $8 per share. Mr. Marsh and Aetna were then in the process of negotiating an agreement whereby Mr. Marsh would sell his shares at a later date at a price to be determined under a formula based on the future performance of PALIC. On March 7, 1967, the outstanding stock of PALIC was held as follows: Mr. Marsh
294,660
First Pyramid Life Ins. Co.
of America
122,890
23 various other shareholders
82,450
Total outstanding shares
500,000
*389 The 23 other stockholders listed above included decedent. These 23 individuals had all previously purchased their shares from Mr. Marsh. On March 7, 1967, Mr. Marsh, Aetna, and the First Pyramid Life Insurance Company of America (First Pyramid) entered into a purchase agreement along the lines of the negotiations summarized in the memorandum which Mr. Marsh had circulated to the other shareholders of PALIC. The purchase agreement was expressly made contingent upon the other 23 shareholders of PALIC accepting an offer to be made by Aetna to purchase all of their shares at a price of $8 per share. Except with respect to Mr. Marsh's shares, the agreement contemplated that closing of the various stock purchase transactions would take place on March 20, 1967. Under the agreement, First Pyramid had agreed to sell all of its 122,890 shares to Aetna at a price of $8 per share. The terms of purchase provided in the agreement with respect to Mr. Marsh's shares, however, were markedly different from those provided for the shares of First Pyramid and those to be extended to the other 23 shareholders. An important part of the agreement, as it concerned Mr. Marsh and Aetna, was that, after *390 Aetna had successfully consummated its purchases of the PALIC shares from the other shareholders, PALIC would issue a further 1.5 million of its authorized but unissued shares to Aetna for $18 million.Of such $18 million, $1.5 million was to be allocated to the paid-in capital of PALIC and $16.5 million was to be allocated to the surplus of PALIC. The agreement further provided basically that Aetna would pay for Mr. Marsh's shares in PALIC at the end of approximately a 5-year period and that the price to be paid to him would be based on the performance of PALIC during such period. The agreement provided that the sale of Mr. Marsh's shares was to be effectuated as of the first of the following three dates: (1) the date of Mr. Marsh's death, (2) any date designated by Aetna or Mr. Marsh by 90 days' written notice to the other, and (3) January 1, 1973. In the event Mr. Marsh died before April 1, 1967, the purchase price to be paid by Aetna for his shares would be $2,357,280. In any other event, the price to be paid for his shares was to be determined according to a formula specified in the agreement. Under this formula, the purchase price to be paid by Aetna was to consist of the *391 sum of the five following elements: (1) $531,000; (2) interest on the $531,000 from April 1, 1967, to the sale date at a specified rate; (3) $1,826,000 multiplied by the ratio (not to exceed 1.0) of actual premiums collected by PALIC on annuities in the 12-month period preceding the sales date over the projected anticipated premiums for the same 12-month period contained in a table included in the agreement; (4) 11 percent of the difference between the adjusted capital and surplus funds shown by PALIC on a specified statement for its last calendar quarter preceding the sales date and $18,901,000 accumulated at interest from April 1, 1967, to such calendar quarter, such interest being calculated at a specified rate; and (5) 11 percent of the difference between the actual premiums collected by PALIC on annuities during the 12-month period before the sales date and $200,000. Under the agreement, Mr. Marsh was to deposit his shares in escrow upon Aetna's closing of the purchase transactions with the other shareholders of PALIC. Additionally, the written resignations of certain of the directors and officers of PALIC were to be submitted to and accepted by PALIC at or before the closing *392 of the purchase transactions with the other shareholders of PALIC. The agreement contemplated that a meeting of the shareholders of PALIC would be held at the place of this closing for the purpose of filling the vacancies in the PALIC board caused by the resignations of these directors. Mr. Marsh and First Pyramid agreed to cause such vacancies on the board of PALIC to be filled by persons named by Aetna. Mr. Marsh also agreed that as of the time of closing he and PALIC would have entered into an agreement satisfactory to Aetna by which he would agree not to compete with PALIC in the variable annuities business for 2 years following the termination of his relationship with PALIC. In accordance with the March 7, 1967, purchase agreement, Aetna, on March 8, 1967, offered to purchase all of the shares held by the 23 other stockholders of PALIC. By March 20, 1967, all of these 23 shareholders, including decedent, had accepted Aetna's offer and sold all of their shares to Aetna. Mr. Marsh, on April 1, 1967, then deposited his shares into escrow pursuant to the arrangement agreed to by himself and Aetna. Additionally, in accordance with the purchase agreement, the present officers *393 of PALIC resigned and Mr. Marsh became the president of PALIC. Shortly after Mr. Marsh had deposited his shares into escrow, he announced a contingent deferred bonus plan for certain employees of PALIC effective April 1, 1967. The contingent deferred bonus plan was a personal plan of Mr. Marsh's and neither PALIC nor Aetna was a party to such plan in any manner whatsoever. Under this plan, a participant would be credited with a certain specified number of monthly bonus unit credits for each full calendar month of employment after April 1, 1967. The future units not yet credited to a participant could at any time be modified or eliminated by Mr. Marsh. Any bonus units credited to a participant would become vested after his completion of 24 months of employment. However, such units credited would become earlier vested upon the following: (1) the death of the participant, (2) PALIC's termination of his employment without cause, or (3) Mr. Marsh's termination of the individual's status as a participant in the plan. Bonus units would thus be forfeited by a participant's voluntary termination of his employment with less than 24 months of service. Additionally, the plan specifically *394 provided that even vested units would be forfeited by a participant no longer an employee of PALIC, if within the 12-month period following the termination of his employment he caused any employee or field representative of PALIC to leave PALIC or caused any of PALIC's insurance or annuity contracts, or participants under any group contract, to lapse or be surrendered. The bonus units credited to an individual, if not forfeited, would entitle him to share in a bonus pool provided under the plan. The plan provided that the bonus pool was to be a percentage of the increase in value of PALIC over the period from April 1, 1967, to the sales date for Mr. Marsh's shares. The amount of the bonus pool was thus tied to the increase in the value of PALIC. The percentage to be applied to the increase in value of the company was based on the ratio of the actual business of PALIC to a prescribed quota of business in accordance with the following table: Percentage to be Applied
in Determining
Bonus Pool
less than.9
None
.90 through.95
.8
.96 through 1.00
1.6
1.01 through 1.10
1.8
1.11 through 1.20
2.0
1.21 through 1.30
2.2
1.31 through 1.40
2.4
1.41 through 1.50
2.6
1.51 or above
2.8
*395 At the sales date for Mr. Marsh's shares, the bonus plan would close and the amount in the bonus pool would be distributed to the participants in the plan. The distribution made to a particular participant would be based upon the number of bonus units credited to him as compared to the total number of bonus units credited to all participants entitled to share in the distribution. The general outline dated August 16, 1968, which explained Mr. Marsh's bonus plan, contained the following statement: 9.Tax Status
There appears to be no question but that the amount distributed is taxable as ordinary income in the year in which received by the participant. However, such amount is subject to the income averaging rules of the Internal Revenue Code which permit it, subject to certain minimums, to be spread back over the previous 4 years in determining the tax bracket applicable to the amount of the bonus. Decedent, as an executive of PALIC, was a participant in the plan and was to be credited with a maximum of four monthly bonus units. Approximately 50 other employees of PALIC, at various times, also participated in the plan. At various times from 1969 through 1972, Mr. *396 Marsh issued notices informing the bonus plan participants of the success of PALIC during the previous calendar quarters and how that success affected and was anticipated to affect the value of the individual participant's payout under the plan in the future. The participants were notified of the current value of one monthly bonus unit and the number of units accumulated by the individual participant. As of December 31, 1972, when the contingent deferred bonus plan ended, decedent had accumulated 276 bonus units under the plan. On January 1, 1973, pursuant to the March 7, 1967, purchase agreement, Mr. Marsh received $7 million for his 294,660 shares in PALIC, or $23.756 per share, as determined under the payment formula contained in the purchase agreement with Aetna. On January 10, 1973, in accordance with the formula established under the contingent deferred bonus plan, decedent received a check from Mr. Marsh in the amount of $61,860. The calculation of the amount was based upon a payment of $240.94 per bonus unit. The body of the letter from Mr. Marsh to decedent dated January 10, 1973, which enclosed the $61,860 check, was as follows: I am pleased to be able to *397 give you this check for $61,860 as a token of my appreciation for the personal contribution you have made to our great Company. Without people such as yourself, our achievements would have been far more modest. Decedent and Mrs. Bateman on their 1973 income tax return filed April 15, 1974, reported gross income of $45,478.03 but did not report the $61,860 received by decedent from Mr. Marsh as income. Respondent and decedent and Mrs. Bateman executed a series of forms 872--Consent Fixing Period of Limitation Upon Assessment of Income Tax--by which they agreed to extend the statutory period for assessment of any income tax due for the taxable year 1973 to April 30, 1980. The statute of limitations for the taxable year 1973 had not expired as of the various times each of the forms 872 were executed. Respondent in his notice of deficiency dated March 18, 1980, determined that decedent and Mrs. Bateman should have included the $61,860 payment received from Mr. Marsh in their income for the taxable year 1973. Decedent and Mrs. Bateman in their petition alleged as an affirmative defense that the notice of deficiency sent by respondent was not timely and that therefore the amount *398 of such deficiency for the year 1973 was barred by the statute of limitations. [3]
Respondent in his answer denied that the statute of limitations barred the assessment and collection of the deficiency determined in the statutory notice. Respondent alleged that pursuant to section 6501(c)(4) respondent and decedent and Mrs. Bateman had consented in writing to extend the statute of limitations to April 30, 1980. Respondent also alternatively alleged that the $61,860 not reported in income by decedent and Mrs. Bateman on their 1973 return exceeded 25 percent of the gross income stated on such return, so that the 6-year period of limitations on assessment and collection provided under section 6501(e)(1)(A) is applicable, and that the sending of the notice of deficiency was made prior to the running of such period. OPINION The first issue *399 for decision is whether the $61,860 received by decedent represented income to decedent and Mrs. Bateman. Petitioners contend that the payment of the $61,860 was a gift by Mr. Marsh and is excludable from gross income under section 102. Respondent, on the other hand, disputes that the payment was a gift under section 102. Respondent asserts that the payment was made pursuant to an incentive arrangement adopted by Mr. Marsh for decedent and other selected employees of the corporation in order to encourage them to make the corporation more profitable in the period prior to the time when Mr. Marsh's shares would be sold. Respondent points out that under the purchase agreement between Mr. Marsh and Aetna, the price for the shares was tied to the performance of the company over about a 5-year period. Section 61 states that gross income means all income from whatever source derived. Section 102(a) provides, however, that gross income does not include the value of property acquired by gift. In , the Supreme Court addressed at length the meaning of the term "gift" as used in section 102. The Court observed *400 that a gift under section 102 proceeds from a detached and disinterested generosity and out of affection, respect, admiration, charity or like impulses.The Court further stated that the controlling factor is the intention of the transferor. The Court also noted that the term "gift" as used in the statute has a different meaning from the common law meaning of the term. As a result, a voluntary transfer of property without any consideration, although a common-law gift, is not necessarily a "gift" within the meaning of the statute. The fact that a transfer was not made pursuant to any legal or moral obligation therefore does not necessarily establish that it is a gift. The transfer is not a gift if the payment proceeds primarily from "the constraining force of any moral or legal duty" or from "the incentive of anticipated benefit" of an economic nature. . Ultimately, the determination of whether there is a nontaxable gift under section 102 is a question of fact, the resolution of which must be arrived at by an application of the finder-of-fact's experience with the mainsprings of human conduct to the totality of the facts *401 presented in the particular case. . Upon examining the evidence presented in the instant case, we agree with respondent that the payment of the $61,860 did not proceed from a "detached and disinterested generosity" on the part of Mr. Marsh. We conclude on the record presented that there was no such donative intention on Mr. Marsh's part. Mr. Marsh, under his agreement with Aetna, would be paid a price for his shares in PALIC which depended upon that company's performance over the approximately 5-year period after his deposit of his shares into escrow. Shortly after depositing his shares into escrow, Mr. Marsh announced the bonus plan for certain designated employees of PALIC. Under this bonus plan, the participants would be entitled to receive distributions from a bonus pool consisting of a percentage of the amount by which the corporation had increased in value during this same period. The clear inference is that Mr. Marsh adopted the bonus plan as an incentive to spur selected employees of PALIC in the performance of their duties and to encourage them to be more productive and make the company more profitable. *402 Any increase in the profitability of PALIC would result in an increase in its value, and thereby result in Mr. Marsh's being entitled to receive a higher amount from Aetna for his shares. The primary purpose of Mr. Marsh in adopting the bonus plan clearly was to procure the receipt of a higher price for his shares in PALIC from Aetna. Petitioners at trial offered the testimony of the decedent. Decedent testified that he, at the time the bonus plan was adopted and during the period of its operation, never perceived the plan as much of an incentive. Decedent stated that the bonus arrangement was so complicated that he never fully understood its provisions and that he also had doubted whether any money would be paid since he always considered it highly possible that Mr. Marsh at a later time might announce that the plan could not be carried out because of some legal problem or technicality. He also testified that he had worked only for his expenses during the initial period in which Mr. Marsh was attempting to get PALIC off the ground, that he had incurred several thousand dollars in unreimbursed moving expenses in moving his family to Virginia as a result of accepting employment *403 with PALIC, and that he and Mrs. Bateman regularly socialized with Mr. Marsh and Mr. Marsh's wife. Based upon this testimony and also on the statements made in the January 10, 1973, letter from Mr. Marsh enclosing the check, petitioners contend that the payment was made primarily as a result of Mr. Marsh's gratitude or generosity towards the decedent. As noted above, the controlling factor is the intention of Mr. Marsh, the transferor. It is therefore not determinative that decedent may not have perceived the adoption of the bonus plan as being much of an incentive. Further, we do not accept petitioners' contention that the primary motivation on Mr. Marsh's part for the payment was a sense of gratitude or generosity with respect to decedent. It is clear to us that in adopting the bonus plan Mr. Marsh was motivated by the prospect of receiving more for his shares from Aetna. The outline explaining the bonus plan which was circulated to the plan's participants contained a statement that the amount distributed pursuant to the plan would be ordinary income to the participants. Further, while Mr. Marsh may have been on friendly terms and have socialized with decedent on a frequent *404 basis, decedent was only one of 50 persons who at one time or another were participants under the bonus plan. Mr. Marsh's actions in administering the bonus plan also show that he was primarily motivated by the prospect of receiving a higher amount for his shares from Aetna. Decedent in his testimony related that he and another individual had been in charge of sales for PALIC as of the date the bonus plan was adopted. This other individual, decedent related, subsequently suffered a heart attack and was unable to carry out his duties at the same level. As a result of this individual's reduced level of performance, Mr. Marsh reduced the number of monthly bonus units which he credited to this individual under the bonus plan. Decedent further testified that after this individual left PALIC, three other individuals shared responsibility for sales with decedent. Decedent stated that Mr. Marsh told him that since the responsibility for sales by the company was now being shared by four people, he was considering reducing the number of monthly bonus units which would be credited to decedent as a participant under the bonus plan. In their conversations concerning a possible reduction of *405 monthly units to be credited to decedent, Mr. Marsh pointed out to decedent that the three other individuals also responsible for sales were each receiving a lesser number of monthly units than the amount per month with which decedent was presently being credited. Decedent stated that he managed to talk Mr. Marsh out of reducing the units per month that would be credited to him. Based upon the evidence presented, we find that the $61,860 payment to decedent was not a nontaxable gift under section 102 but represented gross income to petitioners. The remaining issue for decision is whether assessment and collection of the deficiency asserted in the statutory notice for the calendar year 1973 is barred by the statute of limitations. Generally, section 6501 provides that the amount of any tax shall be assessed within 3 years after the return was filed. In the instant case, the record shows that decedent and Mrs. Bateman filed their joint return for 1973 on April 15, 1974. The general rule provided in section 6501(a) is that the statute of limitations would expire 3 years after the April 15, 1974, filing date of the return. However, under section 6501(c)(4), respondent and a taxpayer *406 may consent in writing to an extension of the period of limitations for assessment of the tax to a period mutually agreed upon, provided such consent is executed by both parties prior to the expiration of the time provided in the statute. Section 6501(c)(4) goes on to state that the period so agreed upon may be further extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. We have found that both respondent and decedent and Mrs. Bateman entered into written agreements prior to the running of the time provided in the statute by which the period of limitations was extended to April 30, 1980. Therefore, the statute of limitations on assessment for the 1973 taxable year had not expired as of the March 18, 1980, dated on which respondent mailed his notice of deficiency to decedent and Mrs. Bateman. As a result of the mailing of the notice of deficiency and the subsequent filing of the petition with this Court, the running of the period of limitations provided in section 6501 has been suspended. Section 6503(a). Therefore, assessment of any deficiency for the taxable year 1973 is not barred by the statute of limitations. Also, *407 since we have found that the $61,860 payment received by Mr. Bateman represented gross income, the 6-year statute of limitations provided under section 6501(e)(1) would be applicable. This $61,860 of income omitted from the return of decedent and Mrs. Bateman is well in excess of 25 percent of the $45,478.03 of gross income reported by them on the return. We find that the statute of limitations under section 6501 does not bar the assessment of the deficiency determined by respondent in his notice of deficiency. Decision will be entered for the respondent.
Footnotes
1. Mr. Bateman died on October 4, 1982, subsequent to the trial in the instant case. Shortly thereafter, Mrs. Bateman and Riggs National Bank of Washington, D.C., were duly appointed as co-executors of his estate. This Court granted the motion of counsel for Mr. and Mrs. Bateman to substitute the estate of Thomas L. Bateman, deceased, Riggs National Bank and Beulah L. Bateman, co-executors, for Mr. Bateman.↩
2. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year here in issue.↩
3. Petitioners make no argument on brief with respect to this affirmative defense. Respondent does argue the issue in his brief and petitioners in their reply brief do not reply to respondent's argument or state that they concede the issue. We therefore assume that the statute of limitations' issue has not been conceded by petitioners.↩