**J. STRICKLAND & COMPANY,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

No. 16225.

United States Court of Appeals
Sixth Circuit.

Nov. 29, 1965.

Robert Waxman, Dept. of Justice, Washington, D. C., (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Atty., Dept. of Justice, Washington, D. C., Thomas L. Robinson, U. S. Atty., Odell Horton, Jr., Asst. U. S. Atty., Memphis, Tenn., on the brief), for appellant.

John R. Stivers, Memphis, Tenn., (Taylor Malone, Jr., Memphis, Tenn., on the brief), for appellee.

Before WEICK, Chief Judge, and CONNELL * and MACHROWICZ,** District Judges.

* Honorable James C. Connell, United States District Judge, for the Northern District of Ohio, sitting by designation.

** Honorable Thaddeus M. Machrowicz, United States District Judge, for the Eastern District of Michigan, sitting by designation.

WEICK, Chief Judge.

The Government has appealed from a judgment rendered against it by the District Court in the amount of $106,711.30, in an action to recover refund of income taxes alleged to have been erroneously assessed and collected for the tax years of 1956 through 1959.

The sole issue was whether an agreement entered into between taxpayer, J. Strickland & Company, and Newbro Manufacturing Company on October 1, 1955, constituted a contract of sale or a license of certain trademarks. In the case of the former, payments made thereunder would be treated for income tax purposes as purchase money, rather than as royalty payments.

The District Court in adopting findings of fact and conclusions of law found that the contract created a relationship of licensor and licensee rather than seller and buyer, and that the payments of $167,392.57 in the four tax years in question were royalties and not purchase money, and could be deducted from income as ordinary business expenses under Sec. 162(a) of the Internal Revenue Code of 1954 (26 U.S.C. § 162(a)).

Both Strickland and Newbro had been engaged in the manufacture and sale of cosmetics. Newbro engaged a broker in New York to sell its machinery, inventory, trademarks and trade names and supplied him with confidential information as to sales of five of its principal products, during the fiscal years 1951–1954. The broker brought the two parties together and they entered into a series of transactions on or about October 1, 1955.

Newbro by two separate agreements and bills of sale sold its raw materials, inventory and manufacturing equipment to Strickland for about $70,000, payable in cash. In the third agreement Newbro appointed Strickland its exclusive manufacturer and sales representative of its five principal products for a term of five years, with the option of either party to renew from year to year on the same terms and conditions, but not to exceed three years' renewal. Strickland was required to pay all expenses of the manufacture, sale and promotion of said products. Newbro agreed to register the trademarks for the products and to keep them in force.

Strickland was to receive seventy-five per cent of the net profits, or in lieu thereof, at the option of either party, was required to pay Newbro a percentage of the net sales on a declining percentage basis, with a minimum guaranteed payment of $35,700 per year. Newbro elected to receive the percentage of net sales with the minimum guarantee.

Three major stockholders of Strickland, controlling 97% of its stock, formed a partnership under the name of The Fourteen Hundred Co. (Fourteen). In an instrument labeled "Escrow Agreement", which was the fourth agreement in the series, Fourteen was granted an option to purchase, for $20,000, the trademarks of the products which were the subject of the licensing agreement. One thousand dollars was paid in cash, and assignments of the trademarks were placed in escrow. The option could be exercised at any time after September 30, 1960, but prior to September 30, 1961.

Strickland commenced performance and for the tax years in question made the following alleged royalty payments to Newbro:

| Year | Payments Made |
|------|--------------|
| 1956 | $ 42,941.81 |
| 1957 | 41,956.47 |
| 1958 | 43,929.15 |
| 1959 | 38,565.14 |
| Total | 167,392.57 |

The option contained in the Escrow Agreement was exercised in 1960, and Newbro received the balance due thereon of $19,000.

In its income tax returns Strickland took deductions from income for the above payments, and Newbro reported the payments it received in its income tax returns as ordinary income.

Oral testimony was offered by Strickland tending to prove that it did not want to purchase the business of Newbro but desired only to purchase the inventory, machinery and equipment, and to obtain a license to manufacture and sell the trademarked articles on a royalty basis.

In addition to the oral testimony, however, letters passing between the parties threw light on their real intent and purpose. In the letter of December 31, 1954 from Elliott Goldstein, counsel for Newbro, to George Long, President of Strickland, the purpose of having the license agreement was discussed.[1] Later, on August 4, 1955, Mr. Goldstein wrote to patent counsel, sending him copies of the agreements and asking advice relative to the patent and trademark angle. He made a further statement relative to the tax situation.[2] On August 4, 1955 Mr. Long wrote to Mr. Goldstein.[3]

In a letter dated September 7, 1955, from Newbro to its broker, the understanding "with respect to your commission on the sale" was reduced to writing.

Mr. Long's letter of August 4, 1955 made it clear that Newbro would receive a guarantee of $270,000 for all the assets embraced in the agreements, including $20,000 under the option.

The guaranteed minimum royalty payments over a period of five years, totaling $178,500, for the use of the trademarks, seem inordinately large if Strickland was acquiring no interest in the marks. They substantially exceeded in each year the net profits realized by Strickland from the manufacture and sale of the products. They were thus greatly in excess of reasonable royalties.

Furthermore, the evidence disclosed that Strickland was expending large sums in advertising and promoting the products covered by the trademarks. This would be most unusual if the marks were to remain the property of Newbro.

We are convinced from a review of the record as a whole that the real agreement between the parties was a sale of the trademarks, although it was thinly disguised for tax purposes as a license.

The transparency of the transaction was not obliterated by taking the option to purchase the marks in the names of the controlling shareholders through the partnership instead of in Strickland's name. In effect, control of the marks still remained in Strickland. The Commissioner could and did look through the form to the substance and treated Strickland and its controlling shareholders as one for tax purposes.

1. "Similarly, we recognize that after the first five years have been paid, only a nominal royalty should be paid, and that you are primarily interested in making sure that the payment is a true royalty, which will be deductible by you.

"As you pointed out, a certain amount of give and take will be involved in working out the details of the royalty agreement. We can state, however, that we are agreed in principle to the idea that any royalty agreement must be one which will be deductible by you, and in order to effectuate this, our client is prepared to sacrifice any capital gains benefits, if necessary, and permit the contract to be drawn in such a way that the payments will be considered ordinary income to it. We do not know that this will be necessary, but wish to assure you that any reasonable concessions will be made by Newbro that are necessary to assure you of the deductibility of the payments made by you under the contract."

(Append. p. 263a)

2. "You will note that this agreement was drawn in such a way as to attempt to assure the purchaser that he would receive a deduction for the sums paid to Newbro."

(Append. p. 272a)

3. "We do think, however, that we have not as yet reached the most important part in the negotiations and that is a closer meeting of minds in the final figure. Before we do attempt a meeting, we want to clarify our viewpoints:

"In our franchise proposal we guarantee you, over a period of five years, $180,000 plus $20,000 in the option, or a total of $200,000.00, plus the real worth or depreciated value of the equipment, plus the true value of your usable and saleable inventory under these four trade names."

(Append. p. 270a)

Since Strickland controlled the option, it had the right to acquire title to the marks, and had an equitable interest in them to the extent of the payments which it made. These payments should be considered as having been made on the purchase price and not treated as royalties. Haggard v. Commissioner, 241 F.2d 288 (9th Cir. 1956); Oesterreich v. Commissioner, 226 F.2d 798 (9th Cir. 1955).

With such a large equity in the marks and substantial investment in advertising, it was practically certain that the option would be exercised. Exercising the option required only a payment of about ten per cent of the total consideration for the marks. Had the option not been exercised, Newbro could have continued the agreement in effect for three more years on the same terms and conditions. Strickland sought to prove by oral testimony that the guaranteed minimum royalty would not be required to be paid in the renewal period, but this evidence, in our opinion, would have varied the terms of the written agreement.

The District Court found that during the course of the negotiations Newbro had declined to furnish financial information to Strickland. The evidence was clear, however, that before closing the deal Newbro had agreed to furnish such information and even to permit an examination of its books and records. (Appendix, pp. 266a, 267a).

Another finding of the District Court was made to the effect that taxpayer wanted the licensing agreement because of possible liability growing out of the sale of one of the products used for straightening hair, called "Silky Strate". This finding seems to overlook the proposition that if Strickland manufactured and sold to the public an inherently dangerous product, the fact that it was operating under a license agreement instead of holding the legal title to the trademarks would not constitute a defense. In any event, Strickland had substantial insurance coverage on all the products. Furthermore, a product known as "Tuxedo Club" was the one which Strickland wanted to obtain and was the real purpose of the agreement.

In our judgment, the finding of the District Court that the agreement was one of license instead of sale was clearly erroneous. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1947).

The judgment of the District Court is vacated and the cause is remanded with instructions to dismiss the complaint.