WILLIAM S. ADAIR AND FLORENCE O. ADAIR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Adair v. Commissioner
Docket Nos. 3881-79, 9235-79, 22777-81, 22778-81.
United States Tax Court
T.C. Memo 1985-392; 1985 Tax Ct. Memo LEXIS 238; 50 T.C.M. (CCH) 620; T.C.M. (RIA) 85392; August 6, 1985. *238 Held: (1) Petitioners in docket No. 3881-79 realized ordinary income on the exercise of stock options in 1973; (2) petitioner in docket Nos. 22777-81 and 22778-81 is entitled to a deduction for compensation upon the exercise of said options; and (3) petitioners in docket No. 9235-79 are taxable on the imputed interest on the stock reissued upon the exercise of said options to petitioners in docket No. 3881-79. H. G. Sparrow, III, and Thomas D. Hammerschmidt, Jr., for the petitioners in docket No. 3881-79. Stephen Wasinger and Richard S. Soble, for the petitioners in docket No. 9235-79. Michael K. Cavanaugh and Robert E. Arroyo, for the petitioner in docket Nos. 22777-81 and 22778-81. Beth L. Williams, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: In docket No. 3881-79, respondent determined the following deficiencies in Federal income tax for the calendar year 1973: Petitioners [2] *239 Deficiency
William S. and
Florence O. Adair
$6,651.75
John J. and
Marianne E. Alf
49,164.72
Hayward V. and
Sandra G. Burton
883.12
George W. and
Betty L. Crawford
1,252.50
Frank J. and
Joyce E. Drayton, Jr. [3]
9,771.60
Thomas A. and
Linda E. McAllister
4,565.50
Lester W. and
Barbara Washington
37,325.46
In docket No. 9235-79, respondent determined a deficiency in Donald R. and Cecile A. Borgeson's [4] Federal income tax for 1973 in the amount of $85,616,80. [5] *240 In docket Nos. 22777-81 and 22778-81, respondent determined the following deficiencies in Clow's Federal income tax: 1971
1972
1973
Docket No. 22777-81
[6] $288,513.00
N/A
N/A
Docket No. 22778-81 [7]
80,514.00
$35,365.00
$124,573.00 The issues addressed in this opinion arise out of or are incident to: (1) The issuance, in 1973, of contingent stock by Clow Corporation (Clow) as required under a 1971 agreement whereby Clow acquired Vulcan Laboratories, Inc. (Vulcan). Prior to the agreement, 99.73 percent of Vulcan stock was owned by petitioner Donald R. Borgeson (Borgeson) and certain petitioners in docket No. 3881-79; and (2) the reissuance *241 of a portion of said contingent stock to petitioners in docket No. 3881-79 upon the exercise of options granted to them by Borgeson. Issues pertaining to said contingent stock were severed from the remaining issues in docket No. 22777-81 and consolidated herein. [8] If the parties are unable to agree upon the value of the Clow stock at the times relevant to these proceedings, a separate trial to determine said value will be held. Thereafter, a computation under Rule 155 [9] will be necessary. The issues presently before the Court are: (1) Whether petitioners in docket No. 3881-79 realized ordinary income in 1973 as a result of exercising options to purchase Clow preferred stock; (2) in the event there was compensation income as described in issue (1), whether Clow is entitled to a corresponding deduction for compensation paid; (3) if Clow is entitled to a deduction as described in issue (2), whether any portion of that deduction is reduced by Clow's imputed interest deduction; and (4) whether the imputed interest with respect to contingent stock received by petitioners in docket No. 3381-79 upon the exercise of options they received from Borgeson is taxable, in whole or part, to said *242 petitioners or to the Borgesons. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time their petitions were filed, petitioners Adair, Alf, Burton, Crawford, Drayton, McAllister, and Borgeson resided in the State of Michigan. Petitioners Washington resided in Dunwoody, Georgia, at the time their petition was filed. Petitioner Clow, a Delaware corporation, had its principal office in Oak Brook, Illinois, at the time its petitions herein were filed. Vulcan was incorporated in Michigan in 1962. At that time, 52 percent of its issued stock was owned by Borgeson and 48 percent was owned by James A. Porter. In 1967, Mr. Porter resigned from Vulcan and all of his stock was redeemed. From the time of the redemption until January 1969, Vulcan was wholly owned by Borgeson. On January *243 24, 1969, Vulcan issued a stock bonus to six key employees "in consideration of [their] competent, diligent and extraordinary service" to Vulcan and "in appreciation for their loyalty to the company and for their substantial contributions to the growth and success" of Vulcan. [10] *244 Each stock bonus recipient paid one dollar as consideration for the shares received. The job position and approximate date of employment by Vulcan of the recipients, as well as the value of each bonus (based on book value of $15.19 per share), were as follows: Date of
Value of
Name
Title
Employment [11]
Shares
Alf
Vice President
1965   $6,379.80
Washington
General Sales Manager
1968   2,886.10
Drayton
Manager, Engineering Sales and
1960   759.50
Detroit Sales Representative
Adair
Bookkeeper, Assistant
1964   455.70
Corporate Secretary
McAllister
Chemist, Field Technical
1963   455.70
Director
Dean
Field Engineer
1967-68
455.70
Following the 1969 stock bonuses, the common stock of Vulcan was owned as follows: Name
Shares
Percentage
Borgeson
10,400
93.27
Alf
420
3.77
Washington
190
1.70
Drayton
50
.45
Adair
30
.27
McAllister
30
.27
Dean
30
.27
11,150
100.00
Vulcan increased each stock bonus recipient's reported wages, as shown on Forms W-2, and withheld income tax with respect thereto. Alf, Washington, Drayton, Adair, and McAllister, all petitioners in docket No. 3881-79, were aware that the 1969 stock bonus was compensation. [12] Consequently, each included said bonus as compensation income on their 1969 Federal income tax returns. In or about November 1969, Borgeson was contacted by officers of Clow concerning the possible acquisition of Vulcan by Clow. Borgeson indicated he was willing to sell his controlling interest for cash but Clow countered with a proposal *245 to exchange Clow stock for Vulcan stock. On December 18, 1969, the Vulcan minority shareholders executed a Power of Attorney appointing Borgeson their attorney in-fact to negotiate and consummate, in his sole judgment and discretion, the sale of their Vulcan stock to Clow. [13]
On January 28, 1970, a reorganization agreement ("Reorganization Agreement") was entered into by Clow and the Vulcan shareholders. In executing this agreement, Vulcan's minority shareholders relied entirely on Borgeson to represent their interests. They did not participate in the negotiations and never gave instructions, or made requests or expressions of dissatisfaction, as to the terms of the deal struck. The Reorganization Agreement provided for the exchange of all outstanding stock of Vulcan for an aggregate of 16,500 shares of Series A Clow preferred stock [14] ("preferred stock"), plus up to an additional 16,500 shares of such stock ("contingent stock") if the profits of Vulcan *246 reached certain levels in Vulcan's fiscal year ending in 1972. [15] *247 The contingent stock was to be delivered within 2 months after the close of Vulcan's 1972 fiscal year. No provision was made for the payment of interest on the contingent stock. The exchange provided for in the Reorganization Agreement was intended by all parties to the reorganization to be, and was treated by them as, a tax-free reorganization under section 368(a)(1)(B). From the reorganization until December 31, 1973 Vulcan was a wholly owned subsidiary of Clow, at which time it was merged into, and became a division of, Clow. As required in the Reorganization Agreement, on or about March 25, 1970, the closing date of the reorganization, each Vulcan shareholder executed and delivered to Clow an identical investment letter advising Clow that he or she: (1) Would receive and hold all Clow preferred stock received under the Reorganization Agreement as an investment and not for resale; (2) had no intention of selling or distributing any shares of said stock; and (3) if he or she thereafter decided to dispose of said stock, would do so only in accordance with the applicable laws and rules of the Securities and Exchange Commission and any applicable state law and, for a period of 3 years, would give Clow at least 10 days advance, written notice of any proposed transer. [16] The Reorganization Agreement explicitly prohibited any assignment *248 except upon the written consent of the other parties. Clow was not required to register any of the preferred stock issued in the reorganization and, as of trial, such stock had not been registered. [17] As of trial, neither the stock, rights to acquire said stock or options on said stock had ever been traded on any market. The Reorganization Agreement did not specify the proportion of preferred stock or contingent stock to be issued *249 to each of the existing Vulcan shareholders but required that, at least 5 days prior to closing, said shareholders jointly request, in writing, the allocation of preferred stock desired. On February 20, 1970, the Vulcan shareholders executed an agreement providing for the allocation of all Clow stock received, or to be received, as part of the acquisition of Vulcan in the same ratio as their existing stock interest in Vulcan. On March 25, 1970, the reorganization closed and the Clow preferred stock was issued in conformance with the shareholder's directive as follows: Number of Shares Issued
Borgeson
15,389
Alf
622
Washington
280
Drayton
74
Adair
45
McAllister
45
Dean
45
In addition to the exchange of stock, the Reorganization Agreement included a provision which ensured that Borgeson, Alf, and Washington would not compete, directly or indirectly, or accept employment with, a Vulcan competitor for a 5-year period. [18] *250 Contemporaneous with the acquisition, Borgeson, Alf and Washington entered 5-year employment agreements with Vulcan. [19]
On several occasions after negotiations with Clow commenced, Borgeson discussed Clow's acquisition of Vulcan with Alf and Washington and indicated his intention to make a portion of his contingent stock available to certain employees in recognition of their loyalty and their past services to Vulcan. As reflected in a December 5, 1969 letter to Alf, Borgeson intended to set up a method whereby Alf and other people that "helped with the growth of Vulcan" could share in any contingent stock he might receive. As of the end of 1969, Borgeson had not determined how to implement this intention or the amount of contingent stock he would give to Vulcan employees but was considering some form of a stock option arrangement. In May 1970, Borgeson was uncertain how many shares of the contingent stock he would receive under the Reorganization Agreement. While *251 he hoped the earnings would warrant issuance of all the contingent stock, he could not be sure until the end of 1972 that this possibility would be realized. However, if such stock was earned, he continued to want to share a portion of it with certain Vulcan employees. On May 12, 1970, Borgeson sent identical letters to each petitioner in docket No. 3881-79 ("Adair petitioners" or "petitioners Adair") and two other employees, Sempowski and Baker, stating: * * * Because of our long-standing association and your past contributions to the success of Vulcan Laboratories, if we do receive any additional stock, I would like to extend the opportunity to you to acquire a portion of the shares which I will receive. Therefore, I will offer you an option to purchase a number of these shares in the event they are available. * * * When we can get together with our attorneys at some future date, we will put this in the form of a formal agreement. Five of the individuals who received May 12, 1970 letters had been shareholders of Vulcan. [20] *252 The remaining individuals' association with Vulcan was as follows: Date of
Employment
Name
Title
by Vulcan
Baker
Manager, Product
1968
Development Chemist
Crawford
Administrative Secretary
1962
Sempowski
Eastern Area Sales Manager
1962
and Sales Representative
Burton
President and sole owner of
N/A
H.V. Burton Co., and independent
manufacturer's representative
company retained by Vulcan in 1960
By letter dated November 9, 1970, Borgeson advised his attorney of his intention to provide former Vulcan shareholders with "additional incentive" by increasing the percentage of contingency stock they would receive. Although he attached a chart listing stock allocation percentages to "act as a guide in disseminating the total contingency" if anything happened to him before the contingency pay out, this allocation varied significantly from that ultimately implemented. Said chart was limited to former shareholders and neither referred to, or effectuated, Borgeson's intent to grant options to select individuals. Prior to January 1972, Borgeson had not determined or advised the Adair petitioners exactly how his intention to provide additional shares of contingent stock to these individuals was to be implemented. [21] Nor had he determined the number of shares he would transfer to any one individual or in total. On or about January 10, 1972, identical option agreements ("Option Agreements") were entered between Borgeson and each of the *253 Adair petitioners. [22] These Option Agreements referred to and implemented Borgeson's intention, as expressed in his May 12, 1970 letters, to enter a formal understanding whereby the optionees would be entitled to purchase shares of the contingent stock which he potentially could receive from Clow. The option recipients understood that, in granting the options, Borgeson was rewarding them for their past loyalty, services, and contributions to Vulcan. Said options were not intended by Borgeson as gifts. Each optionee paid $10.00 consideration and was granted the right to purchase, for 25 cents per share, an unspecified number of contingent shares. The actual number of shares which could be purchased was determined under a formula included in each agreement. [23] *255 The Option Agreements *254 further provided that, within 45 days of Borgeson's receipt of stock certificates for the contingent stock, he would provide the optionees with notice of said receipt. Within 90 days thereof, the options could be exercised by written notice of the optionee's intent to exercise his or her option specifying the number of shares to be purchased. Within 10 days of said notice and tendering the option price, Borgeson was to deliver stock certificates the executed assignments of stock to each optionee. At all times after the options were granted, each recipient intended to exercise his or her respective option for the maximum number of shares available and Borgeson expected that the recipients would take full advantage of their opportunity to acquire by option the contingent stock. As noted above, Borgeson was not confident that all of the contingent stock would be earned when the Reorganization Agreement was executed or when he resolved to extend option opportunities to select individuals. Until the calendar year 1972 ended, it was uncertain if sufficient shares of contingent stock to activate the options would be earned. At that time it was determined that Vulcan's profit levels for 1972 were sufficient to entitle the former Vulcan shareholders to receive the maximum 16,500 contingent shares. Borgeson believed that his grant of the options in January 1972 provided an increased incentive and accounted, in part, for the fact that the maximum number of contingent shares were earned. Clow informally learned that Borgeson had extended options on a portion of his contingent stock during 1972. Prior to entering the Option *256 Agreements, Borgeson did not request Clow's consent to his transfer of stock as required under the Reorganization Agreement. In January 1973, when Borgeson realized the maximum shares of contingent stock had been earned, he requested that the portion of his contingent stock which was subject to the options be issued directly to the optionees. Clow refused this request and advised Borgeson that, under the Reorganization Agreement, it was required to issue the contingent stock to which he became entitled directly to him and could not transfer ownership of Borgeson's contingent stock prior to issuance, and direct issuance to Borgeson would support Vulcan's compensatory deduction on the reissuance of the contingent stock to the optionees. [24]
On March 2, 1973, the seven former Vulcan shareholders received certificates for the contingent shares due them under the Reorganization *257 Agreement. Since the maximum number of contingent shares had been earned, pursuant to the February 20, 1970 allocation letter, each former Vulcan shareholder received the same number of contingent shares he or she had received of Clow preferred stock at the reorganization closing. Pursuant to the Option Agreements, on March 30, 1973, Borgeson gave written notice to each Adair petitioner, Sempowski, and Baker, that he had received the maximum number of shares of contingent stock and specified in the notice the maximum number, and total price, of contingent shares each optionee was entitled to purchase. On or before April 2, 1973, each optionee advised Borgeson, in writing, that said optionee was exercising his or her right to purchase the maximum number of contingent stock and paid Borgeson the purchase price specified in the Option Agreements as follows: Name
No. of Shares
Amount Paid
Alf
2,730
$682.50
Washington
2,420
605.00
Drayton
926
231.50
Adair
455
113.75
McAllister
455
113.75
Burton
113
28.25
Crawford
113
28.25
Baker
113
28.25
Sempowski
113
28.25
The amounts paid by the optionees were significantly less than the fair market value of the Clow stock they received. By memorandum dated April 3, 1973, Borgeson *258 returned his certificate for 15,389 shares of contingent stock to Clow and requested that it reissue the stock to reflect the exercise of the January 10, 1972 options. By letter dated April 18, 1973, which was countersigned by Borgeson, Clow agreed to transfer the contingent shares to Borgeson's optionees upon Borgeson's agreement to indemnify Clow for any liability which might be asserted against it as a result of said transfer and receipt of investment letters of each optionee. Although Clow's prerequisites to the transfer were met, on June 25, 1973, Clow returned the certificate and investment letters of the nine optionees to Borgeson. No reason was given in the cover letter for the return of these documents or Clow's failure to reissue certificates for Borgeson's contingent stock as requested. Borgeson was orally advised, however, that Clow's refusal was based on tax consequences. By letter dated August 28, 1973, Borgeson again returned his certificate for contingent stock to Clow requesting that the shares be reissued in accord with the executed options. On September 5, 1973, Borgeson, in writing, renewed this request. On September 10, 1973 certificates reissuing a portion *259 of Borgeson's contingent stock per his instructions were mailed to him for distribution to his optionees. Borgeson delivered the reissued stock certificates to the optionees between September 17 and 25, 1973. During the almost 5-month lapse between Borgeson's initial request and the reissuance of a portion of his contingent stock, Clow entered discussions with Alf and Washington, as the representatives of the optionees, concerning the redemption of the option shares. The discussions culminated in an agreement whereby, on August 29, 1973, Clow agreed to redeem the 7,438 shares of yet-to-be reissued option contingent stock and requested that Alf furnish Clow with the names of the optionees interested in having said stock remeemed. On October 8, 1973, Clow redeemed all of the contingent stock which the optionees had received for $70.00 per share. [25] As reflected in a resolution adopted by Clow's Board of Directors at their October 11, 1973 meeting, an impetus for this redemption was that: * * * counsel for the Company have advised that in their opinion receipt of these shares by the employees was taxable income to them and by reason of the amounts involved many or all of them would *260 not have had sufficient cash to pay the income tax thereon; * * * Clow did not communicate to the optionees its reasons for redeeming these shares. As shown in the following table, with the exception of Crawford, the redemption paid to each Adair petitioner significantly exceeded their 1973 compensation from Vulcan: Redemption
1973 Vulcan
Optionee
Paid
Compensation
Alf
$191,100
$22,000.16
Washington
169,400
21,666.76
Drayton
64,820
3,825.00
Adair
31,850
11,342.00
McAllister
31,850
13,266.74
Burton
7,910
N/A
Crawford
7,910
9,249.63
On their 1973 returns, the optionees reported the redemption of the contingent stock they had received as a capital transaction and claimed capital gains treatment for these proceeds. Petitioners Adair and Borgeson did not report any interest income with respect to the contingent stock they received in 1973. Although no Forms W-2 or 1099 were issued, or amounts withheld, relating to the option contingent stock, Clow claimed a section 83 compensation deduction equal to the optionees' stock redemption on its 1973 consolidated return. *261 Respondent issued notices of deficiency challenging each petitioner's treatment of the tranactions at issue herein. OPINION The first issue we address is whether the tax consequences of the transfer of contingent shares by Borgeson to petitioners Adair and determined by reference to section 83. Section 83(a)[26] *262 provides that property transferred "in connection with the performance of services" is included in the gross income of the transferee in an amount equal to the excess of the fair market value over the amount paid for the property transferred. This section is applicable to the transfer of any property, including stock and stock options, to employees and independent contractors in connection with the performance of past, present or future services. Alves v. Commissioner,734 F.2d 478 (9th Cir. 1984), affg. 79 T.C. 864 (1982); Sakol v. Commissioner,574 F.2d 694 (2nd Cir. 1978), affg. 67 T.C.. 986 (1977); Cohn v. Commissioner,73 T.C. 443 (1979); secs. 1.83-1(a) and 1.83-3(e), Income Tax Regs. The property need not be transferred by the person for whom the services are performed for section 83 to control. Section 1.83-1(a)(1), Income Tax Regs. The Adair petitioners argue that the transfer of stock *263 constituted a tax-free gift from Borgeson. In the alternative, they argue that the property transfer was an added inducement to gain their acquiescence to Clow's acquisition of Vulcan, constituted additional consideration for the reorganization and is, therefore, subject to capital gain treatment. In contrast, Borgeson, Clow, and respondent contend that said transfer was made in recognition of petitioners Adair's past services and contributions to Vulcan and an incentive to maintain their job performance in the future. We agree with the latter position. Petitioners Adair advance a three-prong argument in support of their gift theory: (1) Since Borgeson did not receive or expect any economic benefit from the options, they must be gifts; (2) since donative intent is not a predicate to a gift under the gift tax provisions, its absence in this case does not preclude a finding that the options were gifts, and; (3) the value of the options was so large in relation to past compensation that the options must be gifts. We are not persuaded that the facts of this case, or the law cited by the Adair petitioners, support a conclusion that the options constituted gifts. As noted above, section 83 *264 applies to transfers of property in connection with past as well as future services. Contrary to petitioners Adair's assertion, it is not a prerequisite to the application of this code section that Borgeson receive or expect any economic benefit from the grant of the options. Cf. Commissioner v. Duberstein,363 U.S. 278, 285 (1960); Robertson v. United States,343 U.S. 711, 714 (1952). We find that, in part, the options were granted in recognition of the Adair petitioners' past services to Vulcan. The fact that some of these petitioners had received stock bonuses in 1969 and that all had been adequately compensated does not preclude additional remuneration, in the form of the options, for past services. Prospectively, at the time the options were granted, Borgeson stood to realize some economic benefit from the option grants. Arguably, the added inducement provided by the options stimulated the performance of the Adair petitioners during 1972 thereby contributing to earning the maximum contingent shares under the Reorganization Agreement. [27]Commissioner v. LoBue,351 U.S. 243, 246-247 (1956); Nagy v. Commissioner,T.C. Memo. 1978-318. As a result, Borgeson directly benefited *265 from the options since, even after the transfer of the option contingent stock, he retained additional stock he might not have otherwise received. Similarly, superior performance of its Vulcan subsidiary would necessarily benefit Clow and potentially could increase the value of Borgeson's Clow stock. Petitioners Adair are correct that the absence of a clear donative intent does not preclude a finding that the options were gifts. Borgeson's intent in granting the options is, however, critical to our determination that the grant of the options were not gifts. Bogardus v. Commissioner,302 U.S. 34, 43 (1937). The record is devoid of any evidence indicating such grant proceeded from "detached and disinterested generosity." Commissioner v. LoBue,supra at 246; *266 Commissioner v. Duberstein,supra.[28] Borgeson's failure to manifest any donative intent is consistent with our conclusion that the grants were intended to be additional compensation. Borgeson did not customarily make gifts to his employees. His only previous grant of stock to employees was compensatory and there is no basis on which to reach a contrary conclusion as to his intent in granting the options in issue. Petitioners Adair's contention that the value of the options is conclusive proof that they were intended as gifts is also unfounded. This contention implies that the fewer the number of shares transferred under the options, the less likely that the options were gifts. We do not agree. Unquestionably the value of the options was disproportionately large in relation to the optionees' salaries. However, it does not follow that, at the time they were granted, this discrepancy was known or even considered. The pertinent time to evaluate this contention is when the options were granted, not when they were exercised. When the options were granted, it was uncertain *267 whether sufficient contingent stock would be earned to activate the options and, consequently, whether the options had any value. An occurrence after the grant, i.e., earning the maximum contingent stock, cannot retroactively determine the character of these transfers. Nor does the volume of stock ultimately transferred under the options affect the transaction characterization. Petitioners Adair advance inconsistent arguments concerning the job performance inducement potential of the options. In support of their gift theory they argue that since certain Adair petitioners could directly receive contingent stock under the Reorganization Agreement, their job performance would not be motivated by the possibility of earning additional stock under the options. We disagree. As shown in the following table, if the maximum shares of contingent stock were earned, the potential reward to these petitioners was significantly greater under the options than under the Reorganization Agreement. Maximum Shares Earnable
Maximum Shares
under Reorganization
Earnable under
Optionee
Agreement
Option
Alf
622
2,730
Washington
280
2,420
Drayton
74
926
Adair
45
455
McAllister
45
455
It is inconceivable that, if they would be *268 influenced in their work performance by the potential to earn contingent stock under the Reorganization Agreement, these petitioners would not apply themselves even more assiduously to increasing Vulcan's earnings for the significantly greater pay-off under the options. We also note that petitioners Burton and Crawford could not earn contingent shares under the Reorganization Agreement since they had not been Vulcan shareholders. Therefore, the job performance influence of potentially earning Clow shares under the options was, as to these individuals, untained. Alternatively, the Adair petitioners argue that the options were granted to induce them to acquiesce in the acquisition of Vulcan by Clow and should be characterized as part of the consideration they received in the reorganization. This is, in fact, how they characterized the transfer on the 1973 Federal tax returns. This argument rests on the assertion that the grant of the options was in fulfillment of a promise by Borgeson to the minority shareholders to grant them additional equity in Vulcan (via additional contingent stock) in return for their participation in the reorganization. We find the factual basis for this argument *269 faulty. Borgeson had not decided to grant options nor were most of the Adair petitioners aware he had even considered granting options at the time the acquisition was consummated. The options were granted almost 2 year after the acquisition was completed. Petitioners Adair offered no explanation for this lengthy delay if, in fact, their participation in the reorganization was contingent on the receipt of additional consideration. Additional inducement is prima facie unnecessary to an accomplished act. In 1970, the Adair petitioners had authorized Borgeson to negotiate the acquisition of Vulcan by Clow on their behalf. At no time did any one of them voice any reservation or dissatisfaction as to the terms of the agreement reached or condition their acquiescence on the receipt of any additional consideration. The cases cited by petitioners Adair in support of this argument deal with dissident shareholders (not employees) who demanded and received additional stock to gain their acquiescence to a proposed acquisition. Gidwitz v. Commissioner,61 T.C. 664 (1974); Delong v. Commissioner,43 B.T.A. 1185 (1941). These cases are inapplicable. There was no reluctance, much less rancor *270 or resistence, evidenced by any Adair petitioner to the acquisition. Further, the options were not proportionate to the stock holdings of Vulcan shareholders. In fact, Dean, a shareholder of Vulcan, received no option. If intended as an inducement to the acquisition, all Vulcan minority shareholders should have been treated consistently. Additionally, optionees Burton, Crawford, Baker, and Sempowski were not Vulcan shareholders. As to them, the grant of options could not have been an inducement to acquiesce to an acquisition in which they had no interest. Having determined that the contingent stock options constituted ordinary income under section 83, the next issue to be resolved is when that income was includible in the Adair petitioners' gross income. They argue that, if section 83 controls, said income is taxable on the grant of the options.[29] We disagree. Section 83(e)(3) provides that section 83 does not apply to "the transfer of an option without a readily ascertainable fair market value." See also section 1.83-3(a)(2), Income Tax Regs. The value of an option without a readily ascertainable fair market value is includible in income on the exercise or disposition, rather *271 than the grant, of said option. Section 1.83-7(a), Income Tax Regs. See Commissioner v. LoBue,351 U.S. 243, 249 (1956), Robinson v. Commissioner,82 T.C. 444 (1984). Options generally have no readily ascertainable market value when granted unless the option is actively traded on an established market. Section 1.83-7(b)(1), Income Tax Regs. The options in issue in this proceeding were not so traded. Section 1.83-7(b)(2), Income Tax Regs., provides: * * * if an option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist: (i) The option is transferable by the optionee; (ii) The option is exercisable immediately in full by the optionee; (iii) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which *272 has a significant effect upon the fair market value of the option; and (iv) The fair market value of the option privilege is readily ascertainable in accordance with paragraph (b)(3) of this section. [30] *273 The facts of this case do not support a finding that the requisite conditions set forth above existed when the options were granted. Cf. Mitchell v. Commissioner,590 F.2d 312 (9th Cir. 1979). We conclude, therefore, that each Adair petitioner is required to include in his/her gross income for 1973 the difference between the fair market value of the option granted by Borgeson and the amount paid on the grant and exercise of the option. [31] The final issue originating in the application of section 83 to this case is whether Vulcan (i.e, Clow) is entitled to a deduction under section 83(h). [32]This section provides, in pertinent part: (h) Deduction by Employer.--In the case of a transfer of property to which this section applies * * * there shall be allowed as a deduction under section 162, to the person for whom were performed the services in connection with which such property was transferred, an amount equal to the amount included under subsection (a) * * * in the gross income of the person who performed such services. Such deduction shall be allowed for the taxable *274 year of such person in which or with which ends the taxable year in which such amount is included in the gross income of the person who performed such services. [33] On its 1973 Federal corporate tax return, Vulcan claimed a deduction under section 83 of $518,800 for the option stock transferred to the Adair petitioners.Respondent disallowed this deduction in its entirety as to the employee-optionees and reduced *275 the deduction attributable to the independent contractor Burton's option stock. [34]
During trial and in his original brief, respondent maintained that a prerequisite to any deduction under section 83(h) was actual inclusion of the value of the options by petitioners Adair in their 1973 income or withholding pursuant to section 3402 by Borgeson, Clow or Vulcan. Since neither of these prerequisites had been met, respondent argued no deduction was allowable under section 83(h). However, in his reply brief, respondent concedes that, if the Court concludes that the Adair petitioners must include as ordinary income under section 83(a) the fair market value of the option contingent stock they received in 1973, Vulcan is entitled to a corresponding deduction. In light of this concession, we need not address respondent's arguments concerning the distinction, if any, between "included" and "includible" income as used in the code section and regulations, the validity of section 1.83-6(a)(2), Income Tax Regs., *276 or its applicability to this case. Section 83(h) clearly provides for a deduction by the person for whom services were performed--in this case Vulcan--equal to the amount petitioners Adair include in income under section 83(a). Section 1.83-6, Income Tax Regs.; Anderson v. Commissioner,67 T.C. 522, 549-550 (1976), affd. per curiam, 583 F.2d 953 (7th Cir. 1978). See also Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 284-285 (1979). The final issues to be addressed in this opinion relate to the applicability of section 483 to the contingent stock issued in 1973. In general, section 483 requires that in the case of a contract for the sale or exchange of property under which deferred payments are due more than 1 year from the date of such sale or exchange and which provides for either no interest or interest payments at a rate below that specified in the Treasury regulations, a portion of each payment received more than 6 months after the date of sale or exchange be treated as interest. The applicability of section 483 to the stock-for-stock reorganization in issue is not disputed by the parties. See Kingsley v. Commissioner,72 T.C. 1095 (1979), affd. 662 F.2d 539 (9th Cir. 1981); *277 Catterall v. Commissioner,68 T.C. 413 (1977), affd. sub nom. Vorbleski v. Commissioner,589 F.2d 123 (3rd Cir. 1978); Solomon v. Commissioner,67 T.C. 379 (1976), affd. 570 F.2d 28 (2d Cir. 1977) and affd. sub. nom. Katkin v. Commissioner,570 F.2d 139 (6th Cir. 1978); section 1.483-2(b)(3)(i), Income Tax Regs. Nor do the parties appear to disagree that imputed interest under section 483 is computed for the period from the execution of the Reorganization Agreement to the issuance of the contingent stock provided for in said Reorganization Agreement. Petitioners Adair also do not dispute that they must include as ordinary income that portion of contingent stock they received directly under the Reorganization Agreement which represents imputed interest.[35] *278 Similarly, Borgeson does not contest inclusion in income of imputed interest as to those shares of contingent stock not subject to an option.The parties disagree, however, as to who is taxable on the imputed interest inherent in the contingent shares reissued pursuant to the Option Agreements and what, if any, impact the resolution of said interest income inclusion issue has on Clow's corresponding interest deduction. Clow, petitioners Adair, and respondent argue that the payment of imputed interest occurred when the contingent shares were issued under the Reorganization Agreement and that the direct recipients of said shares must include in ordinary income the value of the shares which represent interest. [36] We agree. See Cocker v. Commissioner,68 T.C. 544 (1977). Accordingly, Borgeson must recognize as ordinary income the interest component of all contingent stock he received. Clow is entitled to a deduction for all imputed interest paid in addition to its compensation deduction under section 83. Borgeson seeks to shift to petitioners Adair all or part of the *279 imputed interest on the option contingent stock. He argues that the options were in substance, if not form, contracts of sale or assignment which effectively shifted to petitioners Adair the right to receive the option contingent stock. [37] After the grant of said options, Borgeson argues, he was merely a conduit for the transfer of these shares, including their interest component, from Clow to petitioners Adair. [38] To maximize the benefit of this argument, Borgeson further argues that these "contracts of sale" were effective as of his May 30, 1970 letters or, at the latest, as of January 1972 when the Option Agreements were executed. By their clear terms, the Option Agreements between Borgeson and petitioners Adair were options, not contracts of sale. Becker v. Commissioner,378 F.2d 767 (3rd Cir. 1967); *280 Robinson v. Commissioner,82 T.C. 444 (1984); Penn-Dixie SteelCorp. v. Commissioner,69 T.C. 837 (1978); Koch v. Commissioner,67 T.C. 71 (1976); Estate of Ogsbury v. Commissioner,28 T.C. 98 (1957), affd. 258 F.2d 294 (2d Cir. 1958). When granted, Borgeson had no right to receive any contingent stock. The grant of the options, therefore, could not operate to transfer any stock to petitioners Adair. Further, the Option Agreements prescribed the manner in which they were to be exercised and until written notification and payment of the option price, the optionees had no enforceable right to any option contingent stock. Nor were they obligated to pay for said stock. The Option Agreements did not represent, or formalize, any transfer, sale, or exchange which would shift the tax consequences of the unstated interest to the optionees. We are not persuaded that these options should be recharacterized as contracts of sale. Borgeson argues that the form of the Option Agreements should be disregarded since he intended to transfer all benefits and burdens of ownership as to the option contingent stock to the optionees and, given the nominal option price, petitioners Adair were under an economic, *281 if not legal, compulsion to exercise their options. Borgeson's intent to transfer stock to petitioners Adair does not constitute such transfer. More is required than intention. Cf. Penn-Dixie Steel Corp. v. Commissioner,supra.Borgeson cites numerous cases in which a purported lease has been recharacterized as a sale, e.g., M & W Gear Co. v. Commissioner,446 F.2d 841 (7th Cir. 1971); Robinson v. Elliot,262 F.2d 383 (9th Cir. 1958); Oesterreich v. Commissioner,226 F.2d 798 (9th Cir. 1955) or royalty payments are recharacterized as a purchase of trademarks, e.g., J. Strickland & Co. v. United States,352 F.2d 1016 (6th Cir. 1965). Contrary to Borgeson's assertions, these cases do not support the proposition that a nominal option price transforms an option into a contract of sale or assignment. Husted v. Commissioner,47 T.C. 664 (1967). The option price is but one factor considered by the Court in recharacterizing the transactions in the cited cases. Clearly, the Adair optionees did not view the Option Agreements as contracts of sale or a transfer to them of any property. Said options gave them a right to acquire contingent stock from Borgeson, if any was earned, by exercising *282 the option, in writing, and tendering the option price. Until they exercised the options in conformance with their terms, Borgeson was under no legal obligation to transfer any stock to them. Becker v. Commissioner,supra.
Contrary to his assertion, after entering the Option Agreements, Borgeson was not merely a conduit for the transfer of contingent shares from Clow to Adair. He remained contractually entitled to receive, and did, in fact, receive, these shares. [39] *283 Said shares constituted part of the purchase price received for his Vulcan stock as well as interest. Solomon v. Commissioner,570 F.2d 28, 34 (2d Cir. 1977). Had Clow failed to perform under the Reorganization Agreement, Borgeson could have sought to enforce that agreement in his own right--not as the agent of petitioners Adair. Further, upon such hypothetical failure to perform by Clow, petitioners Adair could not have sought to enforce the Reorganization Agreement as to the option contingent stock. They had no rights under the Reorganization Agreement to such stock. Based on the foregoing, Appropriate orders will be entered.
Footnotes
1. Cases of the following petitioners are consolidated for trial, briefing, and opinion: John J. and Marianne E. Alf, Hayward V. and Sandra G. Burton, George W. and Betty L. Crawford, Frank J., Jr., and Joyce E. Drayton, Thomas A. and Linda E. McAllister, and Lester W. and Barbara Washington, docket No. 3881-79; Donald R. and Cecile A. Borgeson, docket No. 9235-79; and, Clow Corporation, docket Nos. 22777-81 and 22778-81.↩
2. Petitioners William S. Adair, Marianne E. Alf, Sandra G. Burton, George W. Crawford, Joyce E. Drayton, Linda E. McAllister, and Barbara Washington are parties to this action solely by virtue of having filed a joint return with their respective spouse. 3. Respondent also determined that petitioners Drayton are liable for an addition to tax of $2,442.90 under section 6651(a). This determination was not challenged in the petition in docket No. 3881-79 and is therefore deemed conceded. Rule 34(b)(4), Tax Court Rules of Practice and Procedure.↩
4. Cecile Borgeson is a party to this proceeding solely by virtue of having filed a joint return with her husband. ↩
5. This deficiency was computed on an increase of $150,780.72 in petitioners' income. $1,292.07 of this increase was attributable to partnership income and was agreed to by petitioners as evidenced by Form 870-I executed on December 29, 1978. The remaining $149,488.65 adjustment to income remains in dispute. 6. A portion of this deficiency is the result of respondent's downward adjustment in the fair market value of the contingent stock issued by Clow to petitioners in docket Nos. 3881-79 and 9235-79. Respondent's deficiency determination in Clow's Federal income tax in docket No. 22777-81 is unrelated to the issues tried in this proceeding. (See infra↩ n. 8). 7. These deficiencies were determined in the Federal coporate tax returns of Vulcan for the fiscal year ended September 30, 1971 and the calendar years 1972 and 1973. (See n.14 infra.↩) Clow has not contested respondent's determination that it is liable for these deficiencies as the transferee of Vulcan.
8. Issues in docket No. 22777-81 and a $100 increase in the charitable contribution deduction in docket No. 22778-81 were resolved by a Stipulation of Partial Settlement filed June 10, 1985. ↩
9. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
10. Borgeson, as president of Vulcan, executed a "Buy-Sell Agreement" with the stock bonus recipients which provided for the purchase by Vulcan of said stock in the event of death, resignation, or termination of employment and, if a recipient contemplated a sale, assignment, transfer or pledge, gave Vulcan the right to purchase said shares. 11. Inconsistencies in the date of employment between the stipulation and the testimony of Washington, Adair, and McAllister have been resolved by relying on the testimony.↩
12. At no time did Borgeson make a gift valued at more than $100 to any Vulcan employee nor, except on rare occasions, did he socialize with said employees except in a business setting.↩
13. To permit the minority shareholders sale of their stock, Vulcan agreed to a release/waiver of the January 1969 Buy-Sell Agreement (see n. 10) for the limited purpose of negotiating with, and the sale or transfer of shares to, Clow.↩
14. As established by resolution of Clow's Board of Directors, after issuance, this new series of stock pays a $6.00 dividend per year in quarterly installments, is cumulative, entitles the record owner to one vote and is convertible into four shares of common stock. A formula for adjustment of the conversion feature, as well as the redemption price, which was set at $103 as of April 1975, is also provided in the resolution. Said resolution was formally adopted as Exhibit A to the Reorganization Agreement. ↩
15. The formula for determining the number of shares of stock to be issued and Vulcan's profits is set froth in paragraph 1(c) and (e) of the Reorganization Agreement. On or about October 1, 1971, Vulcan changed from a fiscal year ending on September 30 to a calendar year for tax and accounting purposes. Consequently, as provided in the Reorganization Agreement, the number of contingent shares and date of delivery was based on the 1972 calendar, rather than fiscal, year.
16. As reflected in a March 25, 1970 letter from Clow countersigned by Borgeson, Borgeson further agreed for a period of 2 years not to make any sale or transfer of any shares of preferred stock received in the reorganization, or any Clow common stock into which it had been converted, which would jeopardize the treatment of the acquisition on a full pooling of interests basis for financial reporting purposes. ↩
17. Each certificate of Clow preferred stock issued in the reorganization bears a legend stating that said security has not been registered, has been acquired for investment and may not be sold or transferred unless registered or an opinion of counsel satisfactory to Clow has been obtained that registration is not required under the Securities Act of 1933.↩
18. Alf, as vice-president of Vulcan, was responsible for the inside management of the company, including administrative, laboratory, and plant functions. Washington, as general sales manager, had full authority over, and responsibility for, all sales and marketing at Vulcan. 19. Alf's employment agreement is dated March 2, 1970, the original date set for closing in the Reorganization Agreement, whereas Borgeson's and Washington's employment agreements are dated March 25, 1970, the actual date of closing.↩
20. Of the former minority shareholders of Vulcan, only Dean did not receive a May 12, 1970 letter. Dean's employment by Vulcan had terminated in early 1970.
21. By letter dated January 26, 1973, Borgeson was advised by his then counsel that it was their opinion that options were granted in 1970 even though a formal agreement was not reduced to writing until 1972. As reflected in this decision, we do not agree with that opinion. ↩
22. Borgeson also entered into identical Option Agreements with Baker and Sempowski which individuals are not petitioners in this proceeding.↩
23. The formula, while varying among the recipients, provided that unless a minimum number of contingent shares were earned none could be acquired under the Option Agreement. After the stated minimum were earned, a sliding scale was provided whereby an increasing percentage of shares could be purchased as the number of contingent shares earned increased. For example, unless 6,576 contingent shares were earned, Crawford was not entitled to purchase any stock under her option. Once this minimum was reached, the percentage of the earned contingent shares which she could purchase increased from .31 to .73 percent (not to exceed 113 shares). Similarly, Washington's percentage range was 11 to 15.74 percent and began at a minimum of 6,109 earned shares.
24. In mid-May 1973, Borgeson reviewed for factual accuracy a draft memorandum of Clow's accountant which discussed in detail Clow's position that, upon reissuance of contingent stock, it would be entitled to a deduction for compensation. Borgeson never questioned this characterization of the effect of reissuance of his stock.↩
25. During 1973, Clow also redeemed 1,000 shares of Borgeson's stock for $70.00 per share.Borgeson reported this as a capital transaction on his 1973 return.↩
26. Sec. 83 PROPERTY TRANSFERRED IN CONNECTION WITH THE PERFORMANCE OF SERVICES (a) General Rule.--If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of-- (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.↩
27. Petitioners Adair argue that not all of the optionees were able to materially increase Vulcan's earnings or effect the amount of contingent stock earned. We will not attempt to second-guess Borgeson as to the past and future value of the optionees contributions to Vulcan's success. We note, however, that Alf and Washington, who unquestionably had significant impact on Vulcan's success, received approximately 70 percent of the option contingent stock.↩
28. See, Estate of Bateman v. Commissioner,T.C. Memo. 1983-400; Estate of Barton v. Commissioner,T.C. Memo. 1983-174↩.
29. The Adair petitioners further argue that the options were granted, at the latest, in 1970, a year not before the Court. We disagree and hold that the options were granted with the execution of the Option Agreements.↩
30. As pertinent, sec. 1.83-7(b)(3), Income Tax Regs., provides: * * * [I]n determining whether the fair market value of an option is readily ascertainable, it is necessary to consider whether the value of the entire option privilege can be measured with reasonable accuracy. In determining whether the value of the option privilege is readily ascertainable, and in determining the amount of such value when such value is readily ascertainable, it is necessary to consider-- (i) Whether the value of the property subject to the option can be asertained; (ii) The probability of any ascertainable value of such property increasing or decreasing; and (iii) The length of the period during which the option can be exercised. ↩
31. As an alternative argument, respondent, in an Amendment to Answer in each docket, argues that if the contingent stock was received by petitioners Adair under the reorganization and not as compensation, Clow's acquisition of Vulcan does not qualify as a valid section 368(a)(1)(B) reorganization. Given our resolution of the Compensation issue, we need not address this alternative argument.↩
32. Borgeson claimed no deduction for the options on his 1973 Federal tax return but in his petition asserted he is entitled to a deduction under sections 83 and/or 212 for the value of the option contingent stock. He did not pursue this argument at trial or on brief and, therefore, we deem it waived. We note, however, that Borgeson is not entitled to a deduction under section 83(h)↩ as he was not the person for whom services were performed. 33. Section 162↩ permits deduction of "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--(1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *." Respondent did not challenge the reasonableness of the compensation deduction.
34. Since the valuation of the options will be addressed in a future opinion, if the parties are unable to reach an agreement as to value, the propriety of this reduction is not considered in this opinion.↩
35. Respondent did not assert any deficiency attributable to imputed interest income as to Burton and Crawford and has, therefore, waived this issue as to these petitioners.
36. The tax deficiencies of the Adair petitioners is unaffected by our resolution of this issue. They are required to include as ordinary income in 1973 the fair market value, less cost, of the option contingent stock they received as compensation. If a portion of said stock were recharacterized as interest income it would, nonetheless, be taxable to them as ordinary income in 1973.↩
37. See sec. 1.483-1(f)(6)(ii), Income Tax Regs.↩, regarding the consequences of a transfer of the right to receive deferred payments. 38. f this argument was accepted, respondent asserts that Clow's deduction for compensation as to the option contingent stock must be reduced by the imputed interest deduction as to these shares so as to avoid duplicative deductions. Given our resolution of the issue, we need not address this argument.↩
39. Having determined no sale or assignment occurred, we need not determine whether Borgeson could have transferred his rights to contingent stock under Michigan State law.